# HAVENS REALTY CORP. ET AL. *v.* COLEMAN ET AL.

No. 80–988.   Argued December 1, 1981—Decided February 24, 1982

364

BRENNAN, J., delivered the opinion for a unanimous Court. POWELL, J., filed a concurring opinion, *post*, p. 382.

*Everette G. Allen, Jr.,* argued the cause for petitioners. With him on the briefs was *James F. Pascal.*

*Vanessa Ruiz* argued the cause for respondents. With her on the brief were *Daniel M. Singer, James B. Blinkoff,* and *Josephine L. Ursini.**

JUSTICE BRENNAN delivered the opinion of the Court.

This case presents questions concerning the scope of standing to sue under the Fair Housing Act of 1968 and the proper construction of § 812(a) of the Act, which requires that a civil suit be brought within 180 days after the alleged occurrence of a discriminatory practice.

I

The case began as a class action against Havens Realty Corp. (Havens) and one of its employees, Rose Jones. Defendants were alleged to have engaged in "racial steering"[1] violative of § 804 of the Fair Housing Act of 1968, 42 U. S. C.

---

*William D. North* and *John R. Linton* filed a brief for the National Association of Realtors as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Reginald M. Barley* for the City of Richmond; by *F. Willis Caruso* for the Leadership Council for Metropolitan Open Communities; and by *Martin E. Sloane* for the National Committee Against Discrimination in Housing, Inc., et al.

Briefs of *amici curiae* were filed by *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Harriet S. Shapiro, Jessica Dunsay Silver, Mildred M. Matesich,* and *Gershon M. Ratner* for the United States; and by *Richard C. Dinkelspiel, Norman J. Chachkin, Roderic V. O. Boggs, Jack Greenberg, James M. Nabrit III, Lowell Johnston, Judith Reed,* and *William L. Taylor* for the Lawyers' Committee for Civil Rights Under Law et al.

[1] As defined in the complaint, "racial steering" is a "practice by which real estate brokers and agents preserve and encourage patterns of racial segregation in available housing by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups." App. 11–12, ¶ 1.

§ 3604 (Act or Fair Housing Act).[2] The complaint, seeking declaratory, injunctive, and monetary relief, was filed in the United States District Court for the Eastern District of Virginia in January 1979 by three individuals[3]—Paul Coles, Sylvia Coleman, and R. Kent Willis—and an organization—Housing Opportunities Made Equal (HOME).

---

[2] Section 804 provides:

"As made applicable by section 803 and except as exempted by sections 803(b) and 807, it shall be unlawful—

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

"(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

"(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.

"(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

"(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin." 82 Stat. 83, as amended, 88 Stat. 729.

The complaint also alleged violation of the Civil Rights Act of 1866, 42 U. S. C. § 1982. Since the judgment of the Court of Appeals did not rest on a violation of § 1982, we have no occasion to consider the applicability of that statute.

[3] The individual plaintiffs averred that they were "members of a class composed of all persons who have rented or sought to rent residential property in Henrico County, Virginia, and who have been, or continue to be, adversely affected by the acts, policies and practices of" Havens. App. 12, ¶ 2.

At the time suit was brought, defendant Havens owned and operated two apartment complexes, Camelot Townhouses and Colonial Court Apartments, in Henrico County, Va., a suburb of Richmond. The complaint identified Paul Coles as a black "renter plaintiff" who, attempting to rent an apartment from Havens, inquired on July 13, 1978, about the availability of an apartment at the Camelot complex, and was falsely told that no apartments were available. App. 13, ¶7; id., at 15, ¶ 12.[4] The other two individual plaintiffs, Coleman and Willis, were described in the complaint as "tester plaintiffs" who were employed by HOME to determine whether Havens practiced racial steering. Id., at 13, ¶7. Coleman, who is black, and Willis, who is white, each assertedly made inquiries of Havens on March 14, March 21, and March 23, 1978, regarding the availability of apartments. On each occasion, Coleman was told that no apartments were available; Willis was told that there were vacancies. On July 6, 1978, Coleman made a further inquiry and was told that there were no vacancies in the Camelot Townhouses; a white tester for HOME, who was not a party to the complaint, was given contrary information that same day. Id., at 16, ¶ 13.

The complaint identified HOME as "a nonprofit corporation organized under the laws of the State of Virginia" whose purpose was "to make equal opportunity in housing a reality in the Richmond Metropolitan Area." Id., at 13, ¶8. According to the complaint, HOME's membership was "multiracial and include[d] approximately 600 individuals." Ibid. Its activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination. Id., at 14, ¶¶8a, 8b.

---

[4] According to the complaint,

"Camelot Townhouses is an apartment complex predominantly occupied by whites. Coles was informed that no apartments were available in the Camelot complex. He was told that an apartment was available in the adjoining Colonial Court complex. The Colonial complex is integrated." Id., at 15–16, ¶ 12.

The three individual plaintiffs, who at the time the complaint was filed were all residents of the city of Richmond or the adjacent Henrico County, *id.*, at 13, ¶ 7, averred that they had been injured by the discriminatory acts of petitioners. Coles, the black renter, claimed that he had been "denied the right to rent real property in Henrico County." *Id.*, at 17, ¶ 14. Further, he and the two tester plaintiffs alleged that Havens' practices deprived them of the "important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices." *Id.*, at 17, ¶¶ 14, 15. And Coleman, the black tester, alleged that the misinformation given her by Havens concerning the availability of apartments in the Colonial Court and Camelot Townhouse complexes had caused her "specific injury." *Id.*, at 16, ¶ 13.

HOME also alleged injury. It asserted that the steering practices of Havens had frustrated the organization's counseling and referral services, with a consequent drain on resources. *Id.*, at 17, ¶ 16. Additionally, HOME asserted that its members had been deprived of the benefits of interracial association arising from living in an integrated community free of housing discrimination. *Id.*, at 17–18, ¶ 16.

Before discovery was begun, and without any evidence being presented, the District Court, on motion of petitioners, dismissed the claims of Coleman, Willis, and HOME. The District Court held that these plaintiffs lacked standing and that their claims were barred by the Act's 180-day statute of limitations, 42 U. S. C. § 3612(a). App. 33–35.[5] Each of the dismissed plaintiffs—respondents in this Court—appealed, and the Court of Appeals for the Fourth Circuit reversed and remanded for further proceedings. *Coles* v. *Ha-*

---

[5] Coles' claims, however, were not dismissed. Rather, they went to trial following the court's certification of a class, represented by Coles, of individuals injured monetarily on or after January 9, 1977, by the steering practices of petitioners.

*vens Realty Corp.*, 633 F. 2d 384 (1980). The Court of Appeals held that the allegations of injury by Willis and Coleman, both as testers and as individuals who were deprived of the benefits of residing in an integrated community, sufficed to withstand a motion to dismiss.[6] With respect to HOME, the Court of Appeals held that the organization's allegations of injury to itself and its members were sufficient, at the pleading stage, to afford the organization standing both in its own capacity and as a representative of its members. The Court of Appeals further held that none of the allegations of racial steering was time-barred, because petitioners' conduct constituted a "continuing violation" lasting through July 13, 1978—less than 180 days before the complaint was filed. We granted certiorari. 451 U. S. 905 (1981).

## II

At the outset, we must consider whether the claims of Coleman, Willis, and HOME have become moot as a result of certain developments occurring after the District Court's dismissal. The first was the District Court's entry of a consent order with respect to Coles' claims. Following the dismissal of respondents' claims, Coles' undismissed claims went to trial, and Havens was found to have engaged in unlawful racial steering.[7] Shortly thereafter, at the request of the parties, the court entered a consent order granting Coles and the class he represented monetary and injunctive relief. App. to Brief for Respondents 10a. The second development con-

---

[6] The court noted that the District Court could require respondents to amend their pleadings to make more specific their allegations, and that if their allegations were "not supported by proof at trial, the case [could] be terminated for lack of standing at an appropriate stage of the trial." 633 F. 2d, at 391.

[7] The court found that the practices violated both the Fair Housing Act and the Civil Rights Act of 1866, 42 U. S. C. § 1982. That determination is not before us, and we intimate no view as to its correctness. See *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 115, n. 32 (1979).

cerns an agreement reached between petitioners and respondents prior to this Court's grant of certiorari.[8] The letter agreement, which expressly provides that it is to become effective only after approval by the District Court, states that if the Court were to deny certiorari, or grant it and affirm, respondents would each be entitled to $400 in damages and no further relief. The agreement provides also that if the Court were to grant certiorari and reverse, respondents would be entitled to no relief whatsoever.

Despite these two developments, this case is not moot. Irrespective of the issue of injunctive relief, respondents continue to seek damages to redress alleged violations of the Fair Housing Act.[9] The letter agreement, if approved by the District Court, would merely liquidate those damages. If respondents have suffered an injury that is compensable in money damages of some undetermined amount, the fact that they have settled on a measure of damages does not make their claims moot. Given respondents' continued active pursuit of monetary relief, this case remains "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240–241 (1937) (citations omitted). See *Powell* v. *McCormack,* 395 U. S. 486, 495–500 (1969); *Bond* v. *Floyd,* 385 U. S. 116, 128, n. 4 (1966).[10]

---

[8] The parties filed the agreement with the Court following oral argument.

[9] The consent order involving Coles' claims did establish a fund to provide damages for "claimants." The parties agree, however, that respondents, whose claims were dismissed as time-barred and on standing grounds, cannot claim against the fund.

[10] It is true that with respect to the claims of HOME in its representative capacity, the complaint only requested injunctive relief, although of a broader nature than that provided in Coles' consent order. Even as to HOME's representative claims, however, the "stringent" test for mootness, *United States* v. *Phosphate Export Assn.,* 393 U. S. 199, 203 (1968), is not satisfied, since the letter agreement, under which HOME agreed not to seek any further injunctive relief and which involves settle-

## III

Our inquiry with respect to the standing issues raised in this case is guided by our decision in *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91 (1979). There we considered whether six individuals and the village of Bellwood had standing to sue under § 812 of the Fair Housing Act, 42 U. S. C. § 3612,[11] to redress injuries allegedly caused by the racial steering practices of two real estate brokerage firms. Based on the complaints, "as illuminated by subsequent discovery," 441 U. S., at 95, we concluded that the village and four of the individual plaintiffs did have standing to sue under the Fair Housing Act, *id.*, at 111, 115.[12] In reaching that conclusion, we held that "Congress intended standing under § 812 to extend to the full limits of Art. III" and that the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section. *Id.*, at 103, n. 9, 109. Thus the sole requirement for standing to sue under § 812 is the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered "a distinct and palpable injury," *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975). With this understanding,

---

ment of an uncertified class action, is still subject to the approval of the District Court. For reasons stated *infra*, at 378, we nevertheless do not reach the question whether HOME has standing in its representative capacity.

[11] Section 812 provides in relevant part:

"(a) The rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction." 82 Stat. 88.

[12] The Court did hold, however, that on the given record it was appropriate to grant summary judgment against the two remaining individual plaintiffs, neither of whom resided within the area alleged to have been adversely affected by the steering practices of the defendants. 441 U. S., at 112, n. 25. But the Court left the District Court free to permit these two individuals "to amend their complaints to include allegations of actual harm." *Id.*, at 113, n. 25.

we proceed to determine whether each of the respondents in the present case has the requisite standing.

## A

The Court of Appeals held that Coleman and Willis have standing to sue in two capacities: as "testers" and as individuals deprived of the benefits of interracial association. We first address the question of "tester" standing.

In the present context, "testers" are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices. Section 804(d) states that it is unlawful for an individual or firm covered by the Act "[t]o represent to *any person* because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available," 42 U. S. C. § 3604(d) (emphasis added), a prohibition made enforceable through the creation of an explicit cause of action in § 812(a) of the Act, 42 U. S. C. § 3612(a). Congress has thus conferred on all "persons" a legal right to truthful information about available housing.

This congressional intention cannot be overlooked in determining whether testers have standing to sue. As we have previously recognized, "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing . . . .'" *Warth* v. *Seldin, supra,* at 500, quoting *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617, n. 3 (1973). Accord, *Sierra Club* v. *Morton,* 405 U. S. 727, 732 (1972); *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205, 212 (1972) (WHITE, J., concurring). Section 804(d), which, in terms, establishes an enforceable right to truthful information concerning the availability of housing, is such an enactment. A tester who has been the object of a misrepresentation made unlawful under § 804(d) has suffered injury in precisely the form the statute was intended to guard against, and there-

fore has standing to maintain a claim for damages under the Act's provisions. That the tester may have approached the real estate agent fully expecting that he would receive false information, and without any intention of buying or renting a home, does not negate the simple fact of injury within the meaning of § 804(d). See *Pierson* v. *Ray*, 386 U. S. 547, 558 (1967); *Evers* v. *Dwyer*, 358 U. S. 202, 204 (1958) *(per curiam)*. Whereas Congress, in prohibiting discriminatory refusals to sell or rent in § 804(a) of the Act, 42 U. S. C. § 3604(a),[13] required that there be a "bona fide offer" to rent or purchase, Congress plainly omitted any such requirement insofar as it banned discriminatory representations in § 804(d).[14]

In the instant case, respondent Coleman—the black tester—alleged injury to her statutorily created right to truthful housing information. As part of the complaint, she averred that petitioners told her on four different occasions that apartments were not available in the Henrico County complexes while informing white testers that apartments were available. If the facts are as alleged, then respondent has suffered "specific injury" from the challenged acts of petitioners, see App. 16, ¶ 13, and the Art. III requirement of injury in fact is satisfied.

Respondent Willis' situation is different. He made no allegation that petitioners misrepresented to him that apart-

---

[13] For the terms of § 804(a), see n. 2, *supra*.

[14] Congress' decision to confer a broad right of truthful information concerning housing availability was undoubtedly influenced by congressional awareness that the intentional provision of misinformation offered a means of maintaining segregated housing. Various witnesses testifying before Congress recounted incidents in which black persons who sought housing were falsely informed that housing was not available. See Hearings on S. 1358, S. 2114, and S. 2280 before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 99 (1967) (testimony of Roy Wilkins); *id.*, at 204, 206 (statement of Gerard A. Ferere); *id.*, at 497 (statement of Whitney M. Young, Jr.).

ments were unavailable in the two apartment complexes. To the contrary, Willis alleged that on each occasion that he inquired he was informed that apartments *were* available. As such, Willis has alleged no injury to his statutory right to accurate information concerning the availability of housing. We thus discern no support for the Court of Appeals' holding that Willis has standing to sue in his capacity as a tester.[15] More to the point, because Willis does not allege that he was a victim of a discriminatory misrepresentation, he has not pleaded a cause of action under § 804(d). We must therefore reverse the Court of Appeals' judgment insofar as it reversed the District Court's dismissal of Willis' "tester" claims.

## B

Coleman and Willis argue in this Court, and the Court of Appeals held, that irrespective of their status as testers, they should have been allowed to proceed beyond the pleading stage inasmuch as they have alleged that petitioners' steering practices deprived them of the benefits that result from living in an integrated community. This concept of "neighborhood" standing differs from that of "tester" standing in that the injury asserted is an indirect one: an adverse impact on the neighborhood in which the plaintiff resides resulting from the steering of persons other than the plaintiff. By contrast, the injury underlying tester standing—the denial of the tester's own statutory right to truthful housing information caused by misrepresentations to the tester—is a direct one. See *Duke Power Co.* v. *Carolina Environmental Study Group*, 438 U. S. 59, 80–81 (1978). The distinction is between "third-party" and "first-party" standing.

This distinction is, however, of little significance in deciding whether a plaintiff has standing to sue under § 812 of the Fair Housing Act. *Bellwood*, as we have already noted, held that the only requirement for standing to sue under

---

[15] Indeed, respondent Willis made no argument in this Court in defense of this holding and appears to concede its error.

§ 812 is the Art. III requirement of injury in fact. As long as respondents have alleged distinct and palpable injuries that are "fairly traceable" to petitioners' actions, the Art. III requirement of injury in fact is satisfied. *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 261 (1977). The question before us, then, is whether injury in fact has been sufficiently alleged.[16]

The two individual respondents, who according to the complaint were "residents of the City of Richmond or Henrico County," alleged that the racial steering practices of petitioners have deprived them of "the right to the important social, professional, business and economic, political and aesthetic benefits of interracial associations that arise from living in integrated communities free from discriminatory housing practices." App. 13, ¶ 7; *id.*, at 17, ¶¶ 14, 15. The type of injury alleged thus clearly resembles that which we found palpable in *Bellwood*. In that case, plaintiffs alleged that the steering practices of the defendants, by transforming their neighborhood in Bellwood from an integrated into an almost entirely black environment, had deprived them of "the social and professional benefits of living in an integrated society" and had caused them "economic injury." 441 U. S., at 111, 115, and n. 30.[17]

---

[16] "[A]s long as the plaintiff suffers actual injury as a result of the defendant's conduct, he is permitted to prove that the rights of another were infringed. The central issue at this stage of the proceedings is not who possesses the legal rights protected by § 804, but whether respondents were genuinely injured by conduct that violates *someone's* § 804 rights, and thus are entitled to seek redress of that harm under § 812." *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S., at 103, n. 9.

[17] Similarly, in *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972), on which *Bellwood* relied, we held that two tenants—one black and one white—of an apartment complex had standing to sue under § 810(a) of the Fair Housing Act, 42 U. S. C. § 3610(a), in challenging the alleged racial steering practices of their landlord. The plaintiffs' averments of injury, held sufficient for purposes of standing, were summarized by the Court in the following terms:

"(1) they had lost the social benefits of living in an integrated community; (2) they had missed business and professional advantages which would

Petitioners do not dispute that the loss of social, professional, and economic benefits resulting from steering practices constitutes palpable injury. Instead, they contend that Coleman and Willis, by pleading simply that they were residents of the Richmond metropolitan area, have failed to demonstrate how the asserted steering practices of petitioners in Henrico County may have affected the *particular* neighborhoods in which the individual respondents resided.

It is indeed implausible to argue that petitioners' alleged acts of discrimination could have palpable effects throughout the *entire* Richmond metropolitan area. At the time relevant to this action the city of Richmond contained a population of nearly 220,000 persons, dispersed over 37 square miles. Henrico County occupied more than 232 square miles, in which roughly 170,000 people made their homes.[18] Our cases have upheld standing based on the effects of discrimination only within a "relatively compact neighborhood," *Bellwood*, 441 U. S., at 114. We have not suggested that discrimination within a single housing complex might give rise to "distinct and palpable injury," *Warth* v. *Seldin*, 422 U. S., at 501, throughout a metropolitan area.

Nonetheless, in the absence of further factual development, we cannot say as a matter of law that no injury could be proved. Respondents have not identified the particular neighborhoods in which they lived, nor established the proximity of their homes to the site of petitioners' alleged steering practices. Further pleading and proof might establish that they lived in areas where petitioners' practices had an appreciable effect. Under the liberal federal pleading standards, we therefore agree with the Court of Appeals that dismissal

---

have accrued if they had lived with members of minority groups; (3) they had suffered embarrassment and economic damage in social, business, and professional activities from being 'stigmatized' as residents of a 'white ghetto.' " 409 U. S., at 208.

[18] According to the Court of Appeals, the population of the city of Richmond as of 1978 was 219,883, while that of Henrico County was 172,922. 633 F. 2d, at 391, n. 5.

on the pleadings is inappropriate at this stage of the litigation. At the same time, we note that the extreme generality of the complaint makes it impossible to say that respondents have made factual averments sufficient if true to demonstrate injury in fact. Accordingly, on remand, the District Court should afford the plaintiffs an opportunity to make more definite the allegations of the complaint. Cf. Fed. Rule Civ. Proc. 12(e). If after that opportunity the pleadings fail to make averments that meet the standing requirements established by the decisions of this Court, the claims should be dismissed.

C

HOME brought suit against petitioners both as a representative of its members and on its own behalf. In its representative capacity, HOME sought only injunctive relief. See App. 17, ¶ 16; *id.*, at 18–20, ¶ 18. Under the terms of the letter settlement reached between petitioners and respondents, however, HOME has agreed to abandon its request for injunctive relief in the event the District Court ultimately approves the settlement. *Supra*, at 370–371, and n. 10. Additionally, in its brief in this Court, HOME suggests that we need not decide whether the organization has standing in its representative capacity. Brief for Respondents 8, n. 8; *id.*, at 39, n. 35. In view of HOME's apparent willingness to abandon this claim, we think it inappropriate that the Court use its resources to resolve an issue for which "such small embers of controversy . . . remain." *Taggart* v. *Weinacker's, Inc.*, 397 U. S. 223, 225 (1970) *(per curiam)*. While we therefore will not decide the question involving HOME's representative standing, we do proceed to decide the question whether HOME has standing in its own right; the organization continues to press a right to claim damages in that latter capacity.

In determining whether HOME has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual: Has the plaintiff " 'alleged such a personal stake in the outcome of the controversy' as to warrant his in-

vocation of federal-court jurisdiction"? *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S., at 261 (emphasis omitted), quoting *Baker* v. *Carr*, 369 U. S. 186, 204 (1962).[19]  In the instant case, HOME's complaint contained the following claims of injury to the organization:

> "Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.  Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's *[sic]* racially discriminatory steering practices."  App. 17, ¶ 16.

If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.  Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests, see *Sierra Club* v. *Morton*, 405 U. S., at 739.[20]  We therefore conclude, as did the Court of Appeals, that in view of HOME's allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.[21]

---

[19] We have previously recognized that organizations are entitled to sue on their own behalf for injuries they have sustained.  *E. g., Warth* v. *Seldin*, 422 U. S. 490, 511 (1975).

[20] That the alleged injury results from the organization's noneconomic interest in encouraging open housing does not affect the nature of the injury suffered, *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 263 (1977), and accordingly does not deprive the organization of standing.

[21] Of course, HOME will have to demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing before it will be entitled to judicial relief.

## IV

Petitioners argue that even if respondents do have standing to sue under the Fair Housing Act, their claims are time-barred under § 812(a) of the Fair Housing Act, 42 U. S. C. § 3612(a). That section requires that a civil suit be brought within 180 days after the alleged occurrence of a discriminatory housing practice.[22] As petitioners note, although five different specific incidents allegedly in violation of the Fair Housing Act are detailed in the complaint, the four involving Coleman occurred more than 180 days before the complaint was filed, and the fifth, which was within 180 days of filing, involved only Coles, whose claims are already the subject of a consent order entered by the District Court. The Court of Appeals, adopting a "continuing violation" theory, held that because the Coles incident fell within the limitations period, none of the claims was barred.

We agree with the Court of Appeals that for purposes of § 812(a), a "continuing violation" of the Fair Housing Act should be treated differently from one discrete act of discrimination. Statutes of limitations such as that contained in § 812(a) are intended to keep stale claims out of the courts. See *Chase Securities Corp.* v. *Donaldson*, 325 U. S. 304, 314 (1945). Where the challenged violation is a continuing one, the staleness concern disappears. Petitioners' wooden application of § 812(a), which ignores the continuing nature of the alleged violation, only undermines the broad remedial intent of Congress embodied in the Act, see *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 417 (1968). Cf. *Zipes* v. *Trans World Airlines, Inc.*, *post*, at 398. Like the Court of Appeals, we therefore conclude that where a plaintiff, pursuant

---

[22] The section reads in pertinent part:

"A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred."

to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice[23] that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.

Applying this principle to the "neighborhood" claims of Coleman and Willis, we agree with the Court of Appeals that the 180-day statute of limitations is no bar. Willis and Coleman have alleged that petitioners' continuing pattern, practice, and policy of unlawful racial steering has deprived them of the benefits of interracial association arising from living in an integrated neighborhood. Plainly the claims, as currently alleged, are based not solely on isolated incidents involving the two respondents, but a continuing violation manifested in a number of incidents—including at least one (involving Coles) that is asserted to have occurred within the 180-day period. HOME, too, claims injury to its counseling and referral services not only from the incidents involving Coleman and Willis, but also from a continuing policy and practice of unlawful racial steering that extends through the last alleged incident. We do not agree with the Court of Appeals, however, that insofar as respondent Coleman has standing to assert a claim as a "tester," she may take advantage of the "continuing violation" theory. Her tester claim is, in essence, that on four isolated occasions she received false information from petitioners in violation of § 804(d). It is not alleged, nor could it be, that the incident of steering involving Coles on July 13, 1978, deprived Coleman of her § 804(d) right to truthful housing information. See App. 16, ¶ 13.

---

[23] Petitioners read § 813 of the Act, 42 U. S. C. § 3613, as permitting only the Attorney General to bring a civil suit under the Act challenging a "pattern or practice" of unlawful conduct. We disagree. That section serves only to describe the suits that the Attorney General may bring, and not to limit suits that private parties may bring under § 812. See *Fort* v. *White*, 383 F. Supp. 949 (Conn. 1974).

## V

In sum, we affirm the judgment of the Court of Appeals insofar as the judgment reversed the District Court's dismissal of the claims of Coleman and Willis as individuals allegedly deprived of the benefits of interracial association, and the claims of HOME as an organization allegedly injured by the racial steering practices of petitioners; we reverse the judgment insofar as it directed that Coleman and Willis may proceed to trial on their tester claims.   Further proceedings on the remand directed by the Court of Appeals shall be consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring.

In claiming standing based on a deprivation of the benefits of an integrated community, the individual respondents alleged generally that they lived in the city of Richmond or in Henrico County.   This is an area of roughly 269 square miles, inhabited in 1978 by about 390,000 persons.   Accordingly, as the Court holds, it is at best implausible that discrimination within two adjacent apartment complexes could give rise to "distinct and palpable injury," *Warth* v. *Seldin*, 422 U. S. 490, 501 (1975), throughout this vast area.   See *ante*, at 377.   This, to me, is the constitutional core of the Court's decision.   "Distinct and palpable" injury remains the minimal constitutional requirement for standing in a federal court.

Although I join the opinion of the Court, I write separately to emphasize my concern that the Art. III requirement of a genuine case or controversy not be deprived of all substance by meaningless pleading.   Our prior cases have upheld standing, in cases of this kind, where the effects of discrimination were alleged to have occurred only within "a relatively compact neighborhood." *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S., 91, 114 (1979).   By implication

we today reaffirm that limitation. See *ante*, at 377. I therefore am troubled, not by the opinion of the Court, but by the record on which that opinion is based. After nearly four years of litigation we know only what the individual respondents chose to plead in their complaint—that they live or lived within a territory of 269 square miles, within which petitioners allegedly committed discrete acts of housing discrimination. The allegation would have been equally informative if the area assigned had been the Commonwealth of Virginia.

In *Warth, supra,* at 501–502, we noted that a district court properly could deal with a vague averment as to standing by requiring amendment:

> "[I]t is within the trial court's power to allow or require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed."

The Federal Rules of Civil Procedure also permit a defendant to move for a more definite statement of the claims against him:

> "If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, he may move for a more definite statement before interposing his responsive pleading. The motion shall point out the defects complained of and the details desired. If the motion is granted and the order of the court is not obeyed within 10 days after notice of the order or within such other time as the court may fix, the court may strike the pleading to which the motion was directed or make such order as it deems just." Fed. Rule. Civ. Proc. 12(e).

See *United States* v. *SCRAP*, 412 U. S. 669, 689–690, n. 15 (1973) (Rule 12(e) motion would have been appropriate for defendants confronted with standing allegations "wholly barren of specifics").

In this case neither the District Court nor apparently counsel for the parties took appropriate action to prevent the case from reaching an appellate court with only meaningless averments concerning the disputed question of standing. One can well understand the impatience of the District Court that dismissed the complaint. Yet our cases have established the preconditions to dismissal because of excessive vagueness, *e. g.*, *Gladstone, Realtors, supra,* at 112–115, with regard to standing, and those conditions were not observed. The result is more than a little absurd: Both the Court of Appeals and this Court have been called upon to parse pleadings devoid of any hint of support or nonsupport for an allegation essential to jurisdiction.

Liberal pleading rules have both their merit and their price. This is a textbook case of a high price—in terms of a severe imposition on already overburdened federal courts as well as unjustified expense to the litigants. This also is a particularly disturbing example of lax pleading, for it threatens to trivialize what we repeatedly have recognized as a *constitutional* requirement of Art. III standing. See, *e. g.*, *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 472–473, 475–476 (1982); *Warth, supra,* at 498.

In any event, in the context of this case, as it reaches us after some four years of confusing and profitless litigation, it is not within our province to order a dismissal. I therefore join the opinion of the Court.