**FEDERAL DEFENDERS OF SAN DIEGO INC., et al., Plaintiffs,**

v.

**UNITED STATES SENTENCING COMMISSION, Defendant.**

Civ. A. No. 87–3161.

United States District Court, District of Columbia.

Feb. 22, 1988.

Alan B. Morrison, Patti A. Goldman, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Joseph di Genova, U.S. Atty., David J. Anderson, Douglas N. Letter, John DePue, Thomas Millet, Dept. of Justice, Washington, D.C., John R. Steer, Gen. Counsel, U.S. Sentencing Com'n, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

Plaintiffs in this case, the Federal Defenders of San Diego and the Federal Pub-

lic Defender for the Middle District of Tennessee, two organizations of criminal defense lawyers, have brought suit to challenge the constitutionality of the sentencing guidelines issued by defendant United States Sentencing Commission.[1] Although there exists a great deal of controversy as to exactly what these new guidelines do—and what they do not do—there can be no doubt that they effect a sweeping, even revolutionary change in the method in which our country will strive to achieve criminal justice. Plaintiffs seek a declaratory judgment that the congressional delegation of power to defendant is excessive and in violation of the non-delegation doctrine and that the method of appointment and removal of the Commission's members violates the doctrine of separation of powers.

Plaintiffs raise serious concerns about the constitutionality of the Guidelines. The substantive issues in this case strike at the core of our evolving constitutional jurisprudence. These issues have arisen in several different contexts recently and have justifiably drawn a great deal of attention. *See e.g. Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Immigration and Naturalization Services v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *In re Sealed Case*, 838 F.2d 476 (D.C.Cir.1988). As plaintiffs accurately point out, the immediate resolution of the constitutional questions which are swirling around the Guidelines may be perceived to be pragmatically in the best interests of many parties. *See e.g. The Washington Post*, Nov. 24, 1987 at A6 (quoting Judge William W. Wilkins Jr., Chairman of the United States Sentencing Commission: "I'm delighted that a lawsuit has been filed this year so that as soon as possible this issue can be finally resolved. Any major piece of legislation is going to be challenged ... The filing of this lawsuit was inevitable, expected and is necessary. Now we should be able to get a decision from the Supreme Court next year"); Affidavit of William P. Redick, Jr., Assistant Public Defender for the Middle District of Tennessee (uncertain constitutionality of Guidelines increases workload of federal defenders and poses potential ethical problems); Affidavit of Judy Clarke, Executive Director of Federal Defenders of San Diego, Inc. (accord).

There can be little question that a prompt resolution of these important issues is crucial to maintaining the orderly functioning of our criminal justice system. In order to achieve a speedy resolution of these important issues, however, it is neither appropriate nor in the long run expedient for this court to stretch traditional standing principles to accommodate this particular case.

A. *Plaintiffs have not Suffered Article III Injury in Fact*

▆ Article III of the Constitution limits this court's power to deciding "cases" and "controversies." *Diamond v. Charles*, 476 U.S. 54, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986). In order to satisfy Article III standing requirements, a party must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102

1. The Federal Defenders of San Diego, Inc., is a non-profit corporation which provides legal representation to indigent defendants who are accused of violating federal criminal statutes in the Southern District of California. In approximately 60% of such cases that proceed beyond an initial appearance, Federal Defenders of San Diego is appointed as counsel. The remaining cases are handled by counsel appointed from a Criminal Justice Act panel. *See generally* Affidavit of Judy Clarke, Executive Director of Federal Defenders of San Diego, Inc.

The Office of the Federal Public Defender for the Middle District of Tennessee provides representation for approximately 75% of the indigent defendants who are accused of violating federal criminal statutes in the Middle District of Tennessee. In the remaining 25% of such cases, counsel is appointed from a Criminal Justice Act panel. *See generally* Affidavit of William P. Redick, Jr., Assistant Public Defender for the Middle District of Tennessee.

S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote and citations omitted). The injury requisite for Article III standing, however, cannot be generalized or abstract. Rather, the party requesting standing must set forth an individuated, concrete injury. *See e.g. Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 2971, 86 L.Ed. 2d 628 (1985) (citation omitted) (party seeking standing must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues"). The alleged injury, or personal stake, must be " 'distinct and palpable,' " *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206 45 L.Ed.2d 343 (1975), and not "abstract" or "conjectural" or "hypothetical," *Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. at 3324 (citing *Los Angeles v. Lyons*, 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1664–1665, 75 L.Ed.2d 675 (1983) and *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)).

The nature of the standing inquiry is therefore by definition a fact-intensive, case-by-case inquiry which involves more than a mere mechanical application of straightforward legal principles. The district court's discretion in making standing decisions flows necessarily from the reality that "the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition." *Allen v. Wright*, 468 U.S. at 751, 104 S.Ct. at 3324.

■ Turning to the specific facts in this case, plaintiffs have failed to meet the threshold, constitutional requirement of injury in fact. It is not possible to "find" constitutional standing for two reasons. First, and foremost, the type of injury or harm alleged by these plaintiffs, who are in essence a collective body of criminal lawyers, cannot be distinguished from the sort of harm or injury absorbed by any legal specialist or group of specialty lawyers who are impacted by a broad and sweeping legislative change. The harm alleged by plaintiffs, as discussed below, essentially boils down to their perception that their workload will be more complex and will markedly increase. The direct result of such an increase in both the burden and the complexity of their work, they fear, will be a reduction in the quality of the legal representation they provide their clients. That sort of "harm" or "injury" is no different from the "harm" that the passage of the Tax Reform Act of 1986 caused for tax lawyers, or for that matter, than the "harm" caused for criminal lawyers by the passage of the Bail Reform and Speedy Trial Acts, which were the predecessor "blockbuster" legislative changes in the criminal law.

■ In addition, the fact that plaintiffs believe their clients will be harmed by the Guidelines does nothing to compensate for their lack of standing in their own right. Permitting lawyers to sue without clients, or at best, with only potential clients, merely because their putative clients allegedly will be harmed, would open the same door for specialist lawyers to sue whenever Congress enacts a statute which impacts on their clientele.[2]

To accept plaintiffs' argument would mean that specialized sections of bar associations throughout the country would be

---

**2.** In fact, as defendants point out, in this case, permitting these plaintiffs to sue without clients would admit a broader right for lawyers to challenge the Guidelines than that possessed by the subject of a criminal proceeding. That is because, as plaintiffs readily admit, the subject of a criminal proceeding who alleges the proceeding is unconstitutional in some form may not bypass the criminal process by challenging the validity of the prosecution in a civil action. *See* Defendant's Memorandum of Points and Authorities in Reply to Plaintiffs' Opposition to Motion to Dismiss at 2. Rather, the subject of a criminal proceeding is limited to challenging the guidelines in the context of that criminal proceeding. *See e.g. Deaver v. Seymour*, 822 F.2d 66 (D.C.Cir.1987); *North v. Walsh*, 656 F.Supp. 414 (D.D.C.1987), *sum aff'd*, No. 87–5054 (D.C.Cir. October 1, 1987), *cert. pending*, No. 87–2174. Therefore, were plaintiffs to have standing in this case, they would be able to challenge the Guidelines in a civil action while their clients would be denied such recourse.

able to sue without regard to whether or not they are representing an identifiable client with a specific grievance. My concern is that such a ruling would open the floodgates to clientless litigation and would render the standing doctrine meaningless. This I am unwilling to do.

The second reason why plaintiffs lack standing is that these plaintiffs simply have not offered a convincing rationale for why the alleged injury that they have suffered from the promulgation of the Guidelines differs in any meaningful sense from those injuries suffered by other participants in the criminal justice system. The impact of the Guidelines on these plaintiffs cannot be distinguished in constitutionally cognizable terms from the effects felt by a variety of other participants in the criminal justice system. Rather, the injury these plaintiffs have suffered, if any, can only be described as generalized and amorphous. Plaintiffs have therefore not suffered the kind of injury which is necessary for purposes of establishing standing under Article III of the Constitution. *See generally Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (denying "citizen standing" because "generalized" and "abstract" interests of citizens are insufficient to meet Article III requirements—and stressing inability to place principled boundaries on such a basis for standing); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (rejecting taxpayer standing because plaintiffs' injury was generalized and not individuated).

Plaintiffs have set forth two separate but closely related injuries they contend they will suffer from the promulgation of the Guidelines. Both derive in large part from the uncertain constitutionality of the Guidelines. Both admittedly will essentially disappear if and when the Supreme Court definitively rules on the constitutionality of the Guidelines. Rigorous scrutiny of plaintiffs' alleged injuries reveals that

neither can serve as the predicate for finding constitutional standing.

The first injury plaintiffs allege is an increased workload due to the need to file numerous briefs challenging the constitutionality of the Guidelines. In addition, plaintiffs claim that their workload will substantially increase because the Guidelines have made plea agreements less attractive. As a direct result, according to plaintiffs, more cases will proceed to trial. They claim the uncertainty that the Guidelines will be constitutionally upheld allegedly compounds this problem—it complexifies the plea bargaining process and introduces unnecessary additional variables into the decisionmaking process.

■ The second injury plaintiffs allege arises from the fact that some of the plaintiffs' clients will be better off under the Guidelines (10%) while the majority will be worse off (90%). According to plaintiffs, if they successfully challenge the constitutionality of the Guidelines on behalf of 90% of their clients, their actions may actually injure the other 10% of their clients who may be better off under the Guidelines. Plaintiffs, relying on the expert opinion of Harvard Law Professor Andrew L. Kaufman, contend that this split may ethically bar them from representing both types of criminal defendants simultaneously. They contend that "at least until the constitutional issue is resolved, they may have to seek to be relieved from representation of the smaller percentage of their clients who would be injured by a ruling that the guidelines are unconstitutional." *See* Plaintiffs' Opposition to Defendant's Motion to Dismiss at 6 (citing Clarke, Redick and Kaufman Affidavits). Furthermore, they assert that the "ethical dilemma is exacerbated" because plaintiffs will rarely know until well into the case whether a particular client will be better or worse off under the Guidelines.

This court has reservations about the ethical dilemma plaintiffs confront.[3] Plain-

---

**3.** The Affidavit submitted by plaintiffs' expert on legal ethics, Professor Kaufman, is a carefully hedged document and plainly leaves the impression that he is not at all certain that "issue conflict" requires disqualification or creates an ethical problem for plaintiffs in each case where

tiffs give the impression that somewhere in the vicinity of 10% of their cases may require them to advocate the constitutionality of the Guidelines. This court believes the actual number of cases where plaintiffs may have to take such a position is substantially smaller.[4] In addition, with all due respect to Professor Kaufman, I am not at all convinced that the taking of inconsistent positions in separate cases raises the sort of ethical dilemma that Professor Kaufman suggests. Despite my skepticism, it is clear from the Clarke and Redick Affidavits that these lawyers may feel uncomfortable taking such positions. They should not be discouraged from recusing themselves when they consider it appropriate. Fortunately, in both the Middle District of Tennessee and the Southern District of California their exist readily available alternative pools of criminal defense lawyers to take the place of those attorneys who elect to recuse themselves for such reasons.[5]

This court therefore has no doubt that there are workable solutions to plaintiffs' perceived potential ethical problems which will not require plaintiffs to violate ethical canons in order to perform their duty. In short, the plaintiffs' alleged ethical dilemma does *not* prevent them from carrying out their representational duties.[6]

Hence, the injury which plaintiff alleges amounts to an increased workload due in greater part to the uncertain constitutionality of the Guidelines and in lesser part to the direct impact of the Guidelines. Once plaintiffs' alleged injury is accurately perceived as merely an increase in workload— or an increase in the difficulty of doing

their duty—it dissolves into nothing more than the sort of harm that could be alleged by any lawyer confronted with new, complex legislation that is vulnerable to constitutional challenge. As discussed above, plaintiffs have been unable to provide this court with any basis for distinguishing their problems from the problems faced by any other organization of lawyers.

Moreover, the burden imposed on these plaintiffs by the new Guidelines is little different from that inflicted on other participants in the criminal justice system. Judges, marshalls, prison officials, parole officers—whose positions are abolished by the enabling legislation underlying the Guidelines—and other participants in the system, all balancing competing responsibilities like these plaintiffs, are all burdened with additional or different responsibilities by the new Guidelines. Although these plaintiffs arguably may have been hit somewhat harder by the Guidelines than the average actor in the system, that is an insufficient basis for alleging an individualized harm. This court does not perceive any basis for permitting these plaintiffs to sue while denying standing to the other participants in the system who are impacted by the Guidelines. Permitting all those impacted individuals to sue would obviously contravene the most basic principles of traditional standing doctrine. *See e.g. Valley Forge,* 454 U.S. at 477, 102 S.Ct. at 761 ("The party who invokes the power [of judicial review] must be able to show ... that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in

they represent a client who is better off under the new Guidelines.

**4.** As defendant points out, both United States Attorneys and Justice Department officials have been instructed not to challenge the constitutionality of the Guidelines. Therefore, since the Government is not going to challenge the Guidelines, the only possible occasion where an affirmative argument (by plaintiffs) for the Guidelines' constitutionality would be necessary, for practical purposes, would be if a judge raised the issue *sua sponte.* That possibility is rather remote.

**5.** *See supra* at 27, n. 1.

**6.** In fact, even though plaintiffs have taken a position in this case and in others pending in San Diego against the constitutionality of the Guidelines, they have proffered no evidence that they have refused representation to any individual who may benefit from the Guidelines. *See* Defendant's Reply to Plaintiffs' Opposition to Motion to Dismiss at 4 ("... the opposition to defendant's motion has failed to supply any concrete instances where this supposed dilemma has impeded their ability to represent their clients to the best of their professional judgment ...").

common with people generally …") (quoting *Frothingham v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)).

Furthermore, this court takes issue with plaintiffs' allegations that the Guidelines will cause an increase in their workload, or burden, and that in turn, as a result of that increase, plaintiffs will provide less satisfactory representation for their clients. First of all, it is by no means certain that the Guidelines will increase the workload of plaintiffs. Although there may be transitional hardships which will increase plaintiffs' burden in the short term, the Guidelines may well, by mechanizing the sentencing process and making it more uniform, reduce the plaintiffs' workload in the long run.

Even if the Guidelines do increase plaintiffs' workload, Congress, in adopting the Guidelines legislation, apparently thought that increased fairness and uniformity in sentencing outweighed this concern. Obviously, these plaintiffs do not think that the potential increase in work is worth these putative benefits—and in fact, plainly believe that their clients are harmed, not helped by the Guidelines. In short, plaintiffs' conception of their "injury in fact" does not stem simply from an increase in workload—but rather, arises from their frustration that the increased work demanded by the Guidelines will be channeled into an end-product which they believe is harmful to their clients. It is doubtful that these plaintiffs would be claiming "injury in fact" were the statute at issue one that is commonly perceived to be helpful to criminal defendants—such as the Speedy Trial Act—even if the statute required them to carry a greater burden.[7] Once the roots of the harm incurred by these plaintiffs are properly identified, it becomes clear that the alleged harm they are suffering is not substantially different from the harm suffered by any lawyer or layperson who takes issue with the Guidelines.

The principal case upon which the plaintiffs rely to support their standing argument is readily distinguishable. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), involved the impairment of the substantive goals of Housing Opportunities Made Equal (HOME), a discrete, narrow public interest group devoted to fair housing. In that case, the racial steering practices of the defendant, Havens, directly frustrated HOME's efforts to achieve its objectives. As a direct result of the harm caused by defendant's steering practices, the Court held HOME had suffered, "concrete and demonstrable injury to [its] activities which "constitute[d] far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379, 102 S.Ct. at 1124. The Supreme Court recognized HOME's standing to sue for damages in its own right because it found HOME possessed "a personal stake in the outcome." In contrast, this case involves, at most, the possible impairment of plaintiffs' efficiency in performing their required duties. The plaintiffs in this case have no real personal stake in the outcome of this litigation. Regardless of whether or not the Guidelines are constitutional, they retain their ability to represent their clients. Although they may believe that their efforts are rendered less fruitful by the Guidelines, that does not mean that the Guidelines impact on their core functioning in the way that Havens' steering practices

---

7. In large part, therefore, plaintiffs' alleged "injury" in terms of increased workload cannot be separated from their obvious dissatisfaction with the substantive impact of the Guidelines on their clients. They assert that the alleged additional work required by the Guidelines interferes with their representational duties. Underlying that assertion is the plain fact that the work required by the Guidelines has not, for these plaintiffs, conceptually become part of their existing representational responsibilities—instead it competes with their ability to perform their "real" duties. In contrast, the additional work required by, for instance, the Speedy Trial Act, because it generally was perceived as being helpful to their clients, was easily melded—both pragmatically and conceptually—into plaintiffs' understanding of their representational duties. Because they became an integrated part of their job, the requirements of such a "good Act" could not, by definition, interfere with their representational responsibilities—rather, those new duties merely reshaped their overall conception of their representational duties as public defenders.

disrupted HOME's ability to achieve its goals.[8]

Furthermore, the Court found that HOME suffered a "concrete and demonstrable injury" because defendant's actions caused a "drain on the organization's resources." 455 U.S. at 379, 102 S.Ct. at 1124. In contrast, in this case, plaintiffs' ability to perform their representational duties are not in any way impaired by the Guidelines. Indeed, in the long run, the Guidelines may improve the efficiency of the sentencing process and reduce the amount of time plaintiffs must devote to that process. Rather, their duties are simply recast by a change in the substantive criminal law.[9] Plaintiffs' budgets have not been cut nor have their staffs been reduced. Their resources remain intact.

Finally, *Havens* involved a lawsuit brought by a single non-profit organization because of injuries suffered at the hands of a single, identifiable realty corporation. The plaintiffs brought suit to enforce a statutory right to fair housing. *See generally* The Fair Housing Act of 1968. In contrast, the plaintiffs in this case are only one segment of a large, undifferentiated mass of potential plaintiffs who allegedly will be similarly harmed by the Guidelines.

B. *Prudential Considerations Cannot Compensate for a Lack of Constitutional Standing*

■ Although plaintiffs arguably have a marked advantage over their opponents in terms of the prudential considerations they have raised, it would be a mistake to depart from, or even to stretch, established constitutional standing doctrine simply to accommodate these prudential needs. The failure to satisfy the constitutional standing requirement of injury in fact cannot be remedied by the presentation of powerful and persuasive prudential reasons for going forward. It would be ironic indeed if plaintiffs, who have emphasized in their well argued brief on the merits that convenience and efficiency cannot substitute for constitutionality, were to prevail on the standing issue simply because of the convenience of this litigation.[10]

C. *There are Prudential Reasons Which Support Dismissal as Well as Going Forward*

Moreover, although plaintiffs recite a litany of prudential reasons for expediting the consideration of the substantive constitutional issues, it is by no means a certainty that the hot pursuit of this suit will actually make a positive contribution toward placing these issues before the Supreme Court. In fact, it may very well be the case that the standing defects in this case would eventually lead to its dismissal, albeit after a substantial expenditure of time and resources—an effort these plaintiffs admittedly can ill afford. Finally, were this case eventually to wind its way to the Supreme Court as the principal or sole vehicle for consideration of the constitutional issues, only ultimately to be knocked out on standing grounds, its prosecution obviously would have had a deleterious effect on plaintiffs' objective of obtaining a speedy substantive review of the Guidelines. For these reasons, it is by no means crystal clear that this case is all that

---

**8.** As discussed above, plaintiffs, cannot derive standing to sue from their belief that the Guidelines are generally unfavorable to their clients—and hence reduce the bottom line effect of their representational efforts. Otherwise their could be no limit placed on their right to sue—and they arguably would have standing to seek a declaratory judgment that, for example, a hypothetical statute permitting certain searches and seizures was unconstitutional under the Fourth Amendment. Similarly, the plaintiff in *Havens* would lack standing to challenge a hypothetical statute which would, for instance, reduce the level of available low-income housing or which would weaken statutory protections against dis-

crimination. *See generally Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**9.** *See supra* at 31.

**10.** *See generally* Plaintiffs' Memorandum in Support of Summary Judgment. *See also* Liman, "The Constitutional Infirmities of the United States Sentencing Commission," 96 *Yale Law Journal* 1363 (1987):

The Sentencing Commission is obviously a convenient solution to the problem of sentence disparity. However, convenience is not a hallmark of the separation of powers and does not cure a violation of its dictates.

plaintiffs believe it is cracked up to be. Instead, it may actually be a costly distraction from the field where the main contest should be waged.

### D. *These Plaintiffs and Their Counsel Will have Their Deserved Day in Court*

Plaintiffs are well recognized and highly regarded Public Defenders. They are ably represented by one of our Nation's finest constitutional lawyers. Together they have a great deal to contribute to the discussion and resolution of the substantive issues posed by the Guidelines controversy. However, although both plaintiffs and their attorney can and should make an important contribution to the eventual resolution of the substantive issues raised herein, the named plaintiffs in this case are inappropriate principals for so doing.

Rather, plaintiffs and their attorney can and should serve the same function in one of two different formats—either in the representation of one of their own individual defendants or as *amicus curiae* in a well chosen, high profile litigation conducted by other able counsel.[11] Moreover, if they participate in such a capacity they will not have to divert a large portion of their energies to address the glaring standing infirmities which afflict them when they try to assume the role of plaintiffs themselves.

Indeed, it is this latter role as *amicus*, although not labelled as such, that they seem to be taking in this litigation. They certainly would be welcome to litigate these important substantive issues if they could produce a "real" injured in fact plaintiff. This they have been unable to do.

11. According to statements made at Oral Argument, plaintiffs and their attorney are counsel in several pending cases in the Southern District of California where motions have been filed challenging the constitutionality of the Guidelines. Oral argument on the constitutionality of the Guidelines before a number of federal district court judges for the Southern District of California, (sitting in their individual capacities), was heard on February 17, 1988. After argument, Judge Rudi Brewster issued an opinion holding that the makeup of the Sentencing

The defendant's motion to dismiss is therefore granted and this case is hereby

ORDERED to be dismissed.

Commission violates the doctrine of separation of powers because it includes Article III judges as members. He therefore found the Sentencing Guidelines to be invalid. *See generally United States v. Arnold and Kulow,* 678 F.Supp. 1463 (S.D.Cal.1987) (order granting motion to invalidate Sentencing Guidelines issued February 18, 1988). *See also* Defendants' Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss at 9, n. 3 (collecting nine criminal cases with motions pending challenging the constitutionality of the Guidelines).