Fred M. MOORE, et al.

v.

RADIAN GROUP, INC., et al.

No. 2:01–CV–23.

United States District Court,
E.D. Texas,
Marshall Division.

Sept. 10, 2002.

## ORDER

WARD, District Judge.

**1. Introduction.**

Putative class representatives Fred Moore and Ronald Hearne sued the defendants, claiming a violation of the Real Estate Settlement Practices Act ("RESPA"). The plaintiffs challenge the relationship between lenders such as the Wells Fargo defendants and primary mortgage insurance ("PMI") providers such as the Radian defendants.

**2. Procedural Posture.**

By order dated March 28, 2002, the court dismissed the plaintiffs' third amended complaint. The court found the plaintiffs' standing allegations deficient and ordered the plaintiffs to replead to allege an actual or threatened injury. The court reasoned that the plaintiffs' allegations that the defendants had violated RESPA, standing alone, was insufficient to confer standing in absence of an allegation of injury. The plaintiffs filed their Fourth Amended Complaint on April 2, 2002. Thereafter, the defendants renewed their motions to dismiss. The parties have fully briefed the standing issues presented in this case, and the matter is ripe for decision. For the following reasons, the court holds that these plaintiffs have failed to allege an injury sufficient to invoke this

court's jurisdiction under Article III. The court therefore dismisses the Fourth Amended Complaint. That dismissal is without prejudice, given that the issue is jurisdictional. Furthermore, these plaintiffs have had multiple opportunities to replead. The court will deny leave to file any further amendments to the complaint.

### 3. *Rivera v. Wyeth–Ayerst Laboratories.*

In this class action case, it is incumbent upon this court to satisfy itself that the named plaintiffs have standing to sue before proceeding to the merits of any certification motion. In *Rivera v. Wyeth–Ayerst Laboratories,* the Court of Appeals held that "the district erred by not demanding" a showing of standing before it certified the class. 283 F.3d 315, 319 (5th Cir.2002). In *Rivera,* the district court certified a class of pharmaceutical purchasers seeking a refund of their purchase price after the manufacturer withdrew the drug from the market due to a risk of liver damages. The Fifth Circuit vacated the certification order and dismissed for lack of standing after it concluded that the plaintiffs had not demonstrated an injury in fact. The plaintiffs had not demonstrated they had suffered any physical or emotional injury, that the drug was otherwise ineffective as a pain killer, or that the drug had any future health risks. The court concluded that even though the certification issue was more straightforward, the district court should have decided standing first, because it went to the court's fundamental power to hear the suit. *Id.* (*citing Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). *Rivera* directs this court to resolve the standing question prior to the certification proceedings. The court therefore turns to that issue.

### 3. Standing

A civil litigant has a duty to plead an actual or threatened injury sufficient to create standing under Article III. *Trinity Industries, Inc. v. Martin,* 963 F.2d 795, 798 (5th Cir.1992). The plaintiffs must clearly and specifically set forth facts to satisfy Article III's standing requirements. A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing. *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990).

Article III requires, at a minimum, that a private litigant suing in federal court have suffered an actual or threatened injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). If there is no actual or threatened injury, there is no case or controversy sufficient to confer jurisdiction on the federal courts. Even if Congress enacts a statute to grant the plaintiffs a cause of action, the plaintiffs "still must show actual or threatened injury of some kind to establish standing in the constitutional sense." *O'Shea v. Littleton,* 414 U.S. 488, 495, 94 S.Ct. 669, 38 L.Ed.2d 674 (1975); *Morales v. Attorneys' Title Ins. Fund,* 983 F.Supp. 1418 (S.D.Fla.1997)(dismissing RESPA claim on standing grounds when plaintiffs paid nothing more than filed rate for title insurance. The filed rate was the lawful rate, and the plaintiffs accordingly had suffered no injury).

To be sure, Congress may create enforceable statutory rights, the invasion of which by a defendant creates standing to sue. As noted by the Supreme Court:

The actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing . . . ." *See Linda R.S. v. Richard D., supra,* 410 U.S., at 617 n. 3, 93 S.Ct., at 1148; *Sierra Club v. Morton,* 405 U.S. 727,

732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). Moreover, the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes. *Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.* Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)(emphasis added).

Illustrative of this concept is *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In *Havens,* the Supreme Court addressed the issue of standing in the context of statutory rights created by Congress when it enacted the Fair Housing Act. In that case, the plaintiffs were "testers" who sought information from landlords concerning the availability of apartments. The plaintiffs alleged that they, as African–Americans, had been told by the landlords that certain apartments were not available for lease but in fact those apartments were available for lease. The testers had no bona fide intent to lease any apartment. Their purpose was to identify and sue discriminating landlords. The district court held that the lack of intent to rent defeated the plaintiffs' standing.

The Supreme Court disagreed. One provision of the Fair Housing Act expressly conferred upon "any person" the statutory right to truthful housing information. The relevant provision of the Fair Housing Act made it unlawful to *"represent* to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

*See Havens,* 455 U.S. 363, 373, 102 S.Ct. 1114 (1982); 42 U.S.C. § 3612(a)(emphasis added). The court determined that the testers were "any person" and they had alleged they had been subjected to untruthful information concerning housing availability by the defendants' conduct. According to the Court, the plaintiffs in *Havens* fell within the class of persons Congress sought to protect with the Fair Housing Act, without regard to whether the plaintiffs actually intended to rent any apartment. The plaintiffs had a Congressionally-created legal right to truthful rental information, and the defendants' misrepresentations invaded that right. That invasion created an injury sufficient to warrant Article III standing to sue.

## 4. RESPA.

The question before this court is whether the RESPA statutory provision on which the plaintiffs' claim rests properly can be understood as granting persons in the plaintiffs' position a right to judicial relief. The answer may be gleaned from an examination of the statute, the legislative history, and the case law that has addressed similar issues.

The plaintiffs claim that the defendants have violated a provision of RESPA that prohibits kickbacks. The relevant provision states that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). A second provision of RESPA, not directly at issue in this case, prohibits the splitting of settlement charges in connection with a federally related mortgage loan transaction other than for services actually rendered. 12 U.S.C. § 2607(b).

Despite these prohibitions against kickbacks and splitting charges, the statute does not prohibit payments for services actually performed or goods actually furnished. RESPA provides that "[n]othing in this section shall be construed as prohibiting ... (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed ...." 12 U.S.C. § 2607(c).

Finally, RESPA contains certain enforcement provisions. The treble damages provision states that "[a]ny person or persons who violate the prohibitions or limitations of this section shall be jointly and severally liable to the person or persons charged *for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such service.*" 12 U.S.C. § 2607(b)(2)(emphasis added). Augmenting the treble damages provision is a section that confers on the Secretary of Housing and Urban Development and certain state officials the right to bring an action to enjoin violations of § 2607. 12 U.S.C. § 2607(d)(4)(empowering the Secretary, the Attorney General of any State, or the insurance commissioner of any State to bring an action to enjoin violations).

### 5. Fourth Amended Complaint.

As with their prior complaints, the plaintiffs' contention in this case is that the mortgage insurers provide agency pool insurance at below-market rates to the mortgage lenders in exchange for the lenders' referral of their PMI business to the mortgage insurers. According to the complaint, the lenders who sell loans on the secondary market (to Government Sponsored Entities ("GSEs") like Fannie Mae and Freddie Mac) must pay a guaranty fee to the GSEs to mitigate the risk of a borrower's early default. The plaintiffs contend that as an alternative to paying the entire guaranty fee, the lenders may purchase pool insurance. The lender's purchase of pool insurance reduces the guaranty fee paid by the lender. Thus, the cheaper the pool insurance, the more profit is reaped by the lender in connection with its sale of the loans on the secondary market.

Against this backdrop is the kickback theory of the plaintiffs' case. The plaintiffs allege that the "thing of value" given by the mortgage insurers is the difference between the agency pool insurance received by the lender and the fair market or reasonable value of the agency pool insurance sold by the mortgage insurer. The plaintiffs aver that, in exchange for this "thing of value," the lenders refer their PMI business to the mortgage insurer providing the below-market agency pool insurance.

The referral of the PMI business is significant. The plaintiffs contend that PMI is very profitable to mortgage insurers such as the Radian defendants. (Fourth Amended Complaint ¶ 24) ("PMI is a highly profitable business for its carrier"). Implicit in that allegation is the assumption that the price commanded for the PMI exceeds (greatly, if one accepts the plaintiffs' allegations as true) the costs incurred by the insurer for underwriting that particular risk. Under the plaintiffs' theory, the lenders pass the charges for PMI through to the borrowers, so the lenders have no incentive to shop for cheaper or better PMI.

The plaintiffs contend, and it is the cornerstone of their case, that they have standing to sue under RESPA even if the referral arrangement does not increase the PMI component of their settlement costs or if none of the PMI settlement charges are kicked-back to the referring lender. Under the plaintiffs' theory, if the mortgage insurers have provided below market pool insurance to lenders in exchange for

the referral of the lenders' PMI business, then the lenders and insurers have violated RESPA section 2607(a). The plaintiffs contend that RESPA's civil enforcement provision, read in conjunction with section 2607(a), entitles the plaintiffs to recover three times the entire amount charged to borrowers for the PMI purchased in connection with the mortgage loans.

The Plaintiffs' Fourth Amended Complaint, filed in response to this court's order of March 28, 2002, confirms this theory of the case. The plaintiffs liken this case to *Havens* and allege that RESPA creates statutory rights to be free from unlawful referral arrangements that the defendants have invaded. The claimed Article III injury, according to the plaintiffs, is this invasion. Alternatively, the plaintiffs contend that Congress, as it did when enacting the Fair Housing Act, has conferred upon borrowers a statutory right to "truthful real estate settlement practices" by virtue of section 2607(a). The court will address each contention.

The plaintiffs' first contention is similar to the one rejected by the court in its March 28, 2002 order. The court's order rejected any reading of RESPA that "presumed injury" for purposes of conferring Article III standing. The court reasoned that a violation of a statute, standing alone, might have the effect of prompting a suit by a federal or state enforcement agency against the malefactors, but such a violation would be insufficient to confer standing on a private plaintiff absent a showing of actual or threatened injury.[1]

In response to that order, the plaintiffs contend that Congress, in enacting 12 U.S.C. § 2607(a), conferred upon borrowers a statutory right to be free from any unlawful · referral or kickback · arrangement, without regard to whether the borrower alleges he or she has suffered any injury as a result therefrom either in the form of increased settlement charges or as a result of having a portion of the settlement charges kicked-back in exchange for the referral. As in their earlier complaints, the plaintiffs avoid pleading that they paid too much for their PMI, that they received PMI that was of inferior quality or that any portion of the settlement charge for PMI was kicked-back in exchange for the referral. They do so presumably because the defendants have alternatively asked for dismissal under the filed-rate doctrine, a doctrine that the defendants assert-and other courts have suggested-would preclude the plaintiffs from challenging in this case the PMI rates set by state agencies.[2]

The plaintiffs rely heavily on a HUD letter opinion and RESPA regulations which provide that "[t]he fact that the transfer of a thing of value does not result in an increase in any charge made by the person giving the thing of value is irrelevant in determining whether the act is prohibited." *See* Settlement Services Memorandum and Regulation X 3500.14(b)(B)(2). The court addressed this argument in its March 28, 2002 order when it drew a distinction between HUD's over-

---

1. The court's March 28, 2002 order provided: *That neither RESPA nor the HUD regulations require direct or indirect injury to a consumer to make out a RESPA violation is beside the point for purposes of Article III standing. This is bedrock. Article III requires, at a minimum, that a private litigant suing in federal court have suffered an actual or threatened injury.... If there is no actual or threatened injury, there is no case* or controversy sufficient to confer jurisdiction on the federal courts. Even if Congress enacts a statute to grant the plaintiffs a cause of action, the plaintiffs "still must show actual or threatened injury of some kind to establish standing in the constitutional sense." (citations omitted).

2. The court expresses no opinion on that question.

sight and investigations into mortgage lending practices and RESPA's private enforcement provision. The former is not at issue, and the court has no quarrel with the fact that HUD may investigate violations of RESPA even if such arrangements cause no actual injury to consumers.

■ The HUD regulations notwithstanding, the question now, as it was in March, is whether Congress intended to allow a private plaintiff to sue for an alleged violation of RESPA's anti-kickback provision when the plaintiff has not alleged that the referral arrangement increased any of the settlement charges at issue or that any portion of the charge for the settlement service was involved in the kickback violation. The courts that have considered the question have rejected the plaintiffs' theory and have concluded that a plaintiff's recovery under the kickback provisions of RESPA is limited to that portion of a particular settlement charge that was excessive or otherwise "kicked-back" in exchange for the referral.

In *Durr v. Intercounty Title Company of Illinois,* 14 F.3d 1183 (7th Cir.1994) the court concluded that RESPA's treble damages provision did not permit the recovery of all of the settlement charges paid by a borrower, but instead only permitted recovery of three-times any alleged *overcharges* kicked-back to a third party. *Durr* involved a claim that a borrower had been overcharged for the recording of the instruments with the clerk's office. The plaintiff sought to recover all of the settlement charges he had incurred, not just that portion of the recording fee that had been excessive. Although the Seventh Circuit found the complaint to be deficient

for other reasons-namely the failure to allege that the overcharge had been kicked back to a third party-the court affirmed the district court's Rule 11 sanctions award related to the excessive damages theory. *Durr* reasoned that there had never been any allegation that certain charges were illegitimate. Without such an allegation, there was no basis for concluding that the defendant was liable for any amount greater than the alleged overcharge.

Likewise, in *Morales v. Attorneys' Title Ins. Fund, Inc.,* 983 F.Supp. 1418 (S.D.Fla.1997), the court reached a result consistent with *Durr.* In that case, the plaintiffs argued that "RESPA allows recovery of the entire title insurance and title evidence charges each one of them paid, rather than the portion of such charges that allegedly represent[ed] a kickback or split prohibited by RESPA." *Id.* at 1427. The court rejected that argument, reasoning that the statute only allowed recovery of three times the charge paid for the settlement services "involved in the violation." *Id.* at 1427. After noting that another section of RESPA, 12 U.S.C. § 2608(a), expressly permitted the recovery of three times *all charges* made for title insurance, the court concluded that the more persuasive reading of sections 2607(a) and (b) only permitted the recovery of three times the amount of the settlement charge which violated RESPA. *Id.* at 1427–28.[3] Ultimately, the *Morales* court decided that the plaintiffs lacked standing to sue under RESPA and that the plaintiffs' claims were barred by the filed-rate doctrine because the object of the claims was to challenge the rates paid

---

**3.** Section 2608(a) prohibits a seller from conditioning the sale of his property on the buyer's use of a particular title insurance company. The penalty for a violation of this provision is three times the entire amount paid by the buyer for the title policy. The plaintiffs in this case make no claim under section 2608(a), as their claims focus on the PMI business allegedly referred to the insurers in exchange for the insurer's sale to the lenders of below-market agency pool insurance.

for title insurance-rates that had been set by the State of Florida. *Id.* at 1429.

Both of these decisions are consistent with one of the primary purposes of RESPA. In the Congressional findings, Congress found that "significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and *are protected from unnecessarily high settlement charges* caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a)(emphasis added). Tying (and trebling) the recoverable damages to that portion of the charge for the settlement service "involved in the violation" advances the purposes of RESPA while respecting Article III's command that a private plaintiff must suffer an actual injury before invoking the jurisdiction of a United States District Court. This approach is also consistent with and gives meaning to section 2607(c) of RESPA, which expressly permits payments for goods actually furnished and services actually performed.

The legislative history of RESPA supports this result. The Senate Report explains the problems addressed by sections 2607(a) and (b) of RESPA:

> In a number of areas of the country, competitive forces in the conveyancing industry have led to the payment of referral fees, kickbacks, rebates and unearned commissions as inducements to those persons who are in a position to refer settlement business. Such payments may take various forms. For example, a title insurance company may give 10% or more of the title insurance premium to an attorney who may perform no services for the title insurance company other than placing a telephone call to the company or filling out a simple application. A discount or allowance for the prompt payment of a title insurance premium or other charge for a settlement service may be given to realtors or lenders as a rebate for the placement of the business with the individual or company giving the discount. An attorney may give a portion of his fee to another attorney, lender or realtor who simply refers a prospective client to him. In some instances, a 'commission' may be paid by a title insurance company to a corporation that is wholly-owned by one or more savings and loan associations, even though that corporation performs no substantial services on behalf of the title insurance company.

> In all of these instances, the payment or thing of value furnished by the person to whom the settlement business is referred tends to increase the cost of settlement services without providing any benefits to the home buyer. While the making of such payments may heretofore have been necessary from a competitive standpoint in order to obtain or retain business, and in some areas may even be permitted by state law, it is the intention of section 7 to prohibit such payments, kickbacks, rebates, or unearned commissions.

S. Rep. No. 93–866 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551.

The Senate Report also explains the treble damages provision:

> Subsection 7(d) imposes both criminal and civil penalties on any person or persons who violate the provisions of the section. The criminal penalty may be a fine of up to $10,000 or imprisonment for up to one year or both. In addition, any person or persons who violate the provisions of the section shall be liable to the person whose business has been referred for *three times the amounts of*

*the proscribed payment, kickback or referral fee.*

*Id.* at 6552 (emphasis added).

As reflected in these passages, the legislative history is consistent with the approach adopted by the court: The treble damages provision extends only to that portion of a settlement service charge that is involved in the RESPA violation. As applied to this case, a private plaintiff would have standing to sue for treble damages measured by that portion of a PMI payment that is excessive (and so caused by an unlawful referral arrangement) or otherwise used to fund a kickback in exchange for the referral of the PMI business.

The court obviously would have been more inclined to find standing to sue on an allegation that the referral arrangement resulted in the plaintiffs paying too much for the PMI they actually purchased. The referral arrangement at issue would appear to make economic sense only if the mortgage insurers offset the losses they suffered by offering below-market pool insurance sales with the profits earned by underwriting other risks. This is not to say, of course, that RESPA only frowns on economically beneficial business referrals. It is simply to emphasize that, as a practical matter, the plaintiffs allege as their motive for the referral arrangement that the PMI sector of the mortgage insurance industry is "highly profitable." Given that allegation, one would naturally expect an allegation that borrowers referred to a particular insurance company were paying excessive rates for their PMI, as a portion of such rates would (perhaps singularly or in combination with other funds) underwrite the losses incurred on the agency pool side of the mortgage insurer's business. The damages suffered by borrowers subjected to such an arrangement would be represented by the difference in the amount paid for the PMI and perhaps the fair market value or otherwise reasonable cost for that service.

But the plaintiffs here make no such claim. They hint that this is the case, *see* Fourth Amended Complaint, ¶ 27 ("The Lenders' incentive is not to find the lowest premiums or highest quality PMI for their customers . . . ."), but they eschew reliance on these as injuries they have actually suffered. Despite this court's request that they plead precisely how they have been injured, the plaintiffs have not done so. The plaintiffs do not contend that they paid too much for PMI. They also do not contend that the PMI, or any other settlement service they received was of inferior quality. They do not contend that any portion of their PMI payments were kicked-back to the lenders or used to underwrite any of the insurers' below-market sales of pool insurance in exchange for the referral. Their contention is that, assuming an unlawful arrangement existed between the lenders and the mortgage insurance providers, the plaintiffs are entitled to recover the entire amounts they paid for PMI, without a showing that the amount, or any portion of it, was involved in any violation of RESPA. The court rejects that position.

■ In the alternative, the plaintiffs contend that section 2607(a) implies a private right to truthful settlement information. The argument is that the defendants' failure to disclose the alleged referral arrangement enabled the defendants to be unjustly enriched at the expense of the plaintiffs and the putative class.

It is beyond doubt that one of the purposes of RESPA was to foster the timely disclosure of information to home purchasers. That purpose notwithstanding, the plaintiffs here seek to read an implied statutory right into one provision of RESPA (section 2607(a)) that has nothing to do

with the communication or disclosure of accurate information. The language of section 2607(a) (as well as section 2607(b)) is devoid of any reference to disclosures to be made at the settlement or closing of a mortgage loan. Although the Congressional findings and statement of purpose allude to RESPA's disclosure aims, the statute on which plaintiffs rely, § 2607(a), is designed to eliminate kickbacks. As noted above, the legislative history suggests that section 2607(a) was enacted to prohibit referrals that tend to increase the cost of settlement services without providing any benefits to the home buyer. S.Rep. 866, 93rd Cong.2d Sess.1974, *reprinted in* 1974 U.S.C.C.A.N. 6546, 6551 (May 22, 1974); *see also Pedraza v. United Guar. Corp.*, 114 F.Supp.2d 1347, 1357 (S.D.Ga.2000)("[Section 2607(a)] does not create any duty on the part of Defendant to disclose the existence of such a scheme to Plaintiff or other members of her class."); *Moll v. U.S. Life Title Ins. Co.*, 700 F.Supp. 1284, 1289 (S.D.N.Y.1988)("[Section 2607(a)] does not, however, create a duty to disclose such payments . . .").

In addition, consistent with the Congressional findings, other provisions of RESPA explicitly address disclosure requirements. *See, e.g.*, 12 U.S.C. §§ 2603 (requiring uniform settlement statements), 2604 (requiring information booklets), 2605 (requiring notices as to escrow accounts). The Fourth Amended Complaint lacks any allegations that the defendants violated any of these statutory provisions.

Finally, the plaintiffs' reliance on *Havens* to support this claim is misplaced. In *Havens*, the statute under which the plaintiffs brought their suit expressly required the disclosure of truthful information concerning real estate availability. The relevant provision of the Fair Housing Act made it unlawful to "represent to any persons because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." *See Havens*, 455 U.S. 363, 373, 102 S.Ct. 1114 (1982); 42 U.S.C. § 3612(a). Thus, to support their claim of injury, the testers at issue in Havens could point to a right expressly created by Congress—the right created by the Fair Housing Act to truthful rental information. The invasion of that right by the defendants created a distinct and palpable injury sufficient to confer Article III standing. In the present case, by contrast, the plaintiffs do not rely on any of the disclosure provisions of RESPA. They rely on a specific provision that, by its terms, has nothing to do with the disclosure of truthful real estate settlement practices. *Havens* is distinguishable, and the court rejects the plaintiffs' standing arguments, to the extent they rely on a statutory right, conferred by 12 U.S.C. § 2607(a), to truthful real estate settlement practices.

For the foregoing reasons, the court grants the defendants' motions to dismiss the plaintiffs' Fourth Amended Complaint. That complaint is dismissed without prejudice, as the court lacks subject matter jurisdiction over this case. All other pending motions, save and except any motions to exceed the page limitations of the court's local rules, are denied as moot. Any motion to exceed page limits is granted.