**Mary ALSTON, individually and on behalf of all others similarly situated; Kevin Collier, individually and on behalf of all others similarly situated; Brad Augunas, individually and on behalf of all others similarly situated**

v.

**COUNTRYWIDE FINANCIAL CORPORATION; Countrywide Home Loans, Inc.; Balboa Reinsurance Company.**

Mary Alston; Kevin Collier; Brad Augunas, Appellants.

No. 08–4334.

United States Court of Appeals, Third Circuit.

Argued: Sept. 22, 2009.

Opinion Filed: Oct. 28, 2009.

Edward W. Ciolko, Esq., (Argued), Joseph H. Meltzer, Esq., Donna S. Moffa, Esq., Terence S. Ziegler, Esq., Barroway, Topaz, Kessler, Meltzer & Check, Radnor, PA, Eric G. Calhoun, Esq., Travis & Calhoun, Dallas, TX, for Appellants.

Christine N. Kohl, Esq. (Argued), Michael J. Singer, Esq., United States Department of Justice, Civil Division, Washington, DC, for USA–Intervenor.

David L. Permut, Esq. (Argued), Thomas Hefferon, Esq., Sallie F. Pullman, Esq., Goodwin Procter, Washington, DC, Martin C. Bryce, Jr., Esq., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Appellees.

Before: BARRY, FISHER and JORDAN, Circuit Judges.

## OPINION OF THE COURT

BARRY, Circuit Judge.

This putative class action was brought by homebuyers who sought to recover statutory treble damages pursuant to section 8(d)(2) of the Real Estate Settlement Procedures Act of 1974 ("RESPA"), codified at 12 U.S.C. § 2607(d)(2). Plaintiffs alleged that their private mortgage insurance premiums were channeled into an unlawful "captive reinsurance arrangement"—essentially, a kickback scheme— operated by their mortgage lender, Countrywide Home Loans ("Countrywide"), and its affiliated reinsurer, Balboa Reinsurance Co. ("Balboa"), in violation of RESPA section 8(a) and section 8(b), 12 U.S.C. § 2607(a)-(b).[1] The thrust of their complaint was that, in enacting and amending section 8, Congress bestowed upon the consumer the right to a real estate settlement free from unlawful kickbacks and

unearned fees, and Countrywide's invasion of that statutory right, even without a resultant overcharge, was an injury-in-fact for purposes of Article III standing. The District Court disagreed and dismissed the complaint without prejudice for lack of jurisdiction. We have jurisdiction over plaintiffs' appeal under 28 U.S.C. § 1291.

What is before us for decision turns on a question of statutory interpretation—does or does not the plain language of RESPA section 8 indicate that Congress created a private right of action without requiring an overcharge allegation? We conclude that it does. Accordingly, we will reverse the Order of the District Court.

## I. Background

### A. Statutory Background

The focus of our attention in this appeal is RESPA section 8 and, thus, we begin by setting forth its various subsections. Section 8(a) prohibits "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). Section 8(b) prohibits unearned fees: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service ... other than for services actually performed." *Id.* § 2607(b). Section 8(c) is a safe harbor provision for certain activities otherwise prohibited by section 8(a) and section 8(b), including the provision of

---

**1.** The then-corporate parent of both Countrywide Home Loans and Balboa Reinsurance Co., Countrywide Financial Corp., was also named as a defendant in this action. Countrywide Financial Corp. was purchased by Bank of America in 2008 and, on April 27, 2009, Countrywide Home Loans became Bank of America Home Loans.

"bona fide ... payment[s] ... for services actually performed." *Id.* § 2607(c)(2).

Congress charged the Department of Housing and Urban Development ("HUD") with the administration and enforcement of RESPA. *Id.* §§ 2607(d)(4), 2617. To that end, HUD can "prescribe such rules and regulations" and "make such interpretations ... as may be necessary to achieve the purposes of [the Act]." *Id.* § 2617(a). HUD's regulations—compiled in the somewhat mysteriously titled "Regulation X"—are set forth at 24 C.F.R. pt. 3500.

RESPA section 8 has a penalties subsection, section 8(d), that both prescribes criminal penalties for section 8 violations, 12 U.S.C. § 2607(d)(1), and authorizes HUD, state attorneys general, and insurance commissioners to bring civil actions for injunctive relief. *Id.* § 2607(d)(4). Congress also authorized private actions against a person who violates section 8. As amended in 1983, section 8(d)(2) provides that "[a]ny person or persons who violate the prohibition or limitations of this section shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service." *Id.* § 2607(d)(2). It is this subsection of section 8 that is the primary focus of our attention and the one we are called upon to construe.

## B. Facts

Plaintiffs obtained home mortgages from Countrywide in 2005 and 2006. Because each plaintiff made a down payment of less than twenty percent, Countrywide required that he or she obtain private mortgage insurance ("PMI").[2] Plaintiffs alleged that Countrywide referred them to mortgage insurers that would "reinsure" their PMI policies with Balboa, a Countrywide affiliate, pursuant to a "captive reinsurance arrangement."[3]

Under a "captive reinsurance arrangement," according to plaintiffs, the lender's affiliate typically provides reinsurance to an unrelated primary mortgage insurer. That insurer and the lender-affiliated reinsurer enter into an agreement under which the former pays the latter a portion of the borrower's insurance premiums; in return, the reinsurer assumes a portion of the primary insurer's risk. Reinsurance agreements generally fall into one of two categories. In a "quota share" agreement, the reinsurer bears a set percentage of all insured losses. In an "excess loss" agreement, the type of agreement at issue here, the primary insurer pays, and is solely responsible for, claims arising out of a given book of business up to a predetermined amount, after which the reinsurer is obligated to reimburse the primary insurer's claims up to another predetermined amount.[4] Above that band of reinsurance,

---

**2.** It is beyond dispute that the provision of mortgage insurance is a "settlement service" within the meaning of 12 U.S.C. § 2602(3) (RESPA's definition subsection). *See* 24 C.F.R. § 3500.2(b); *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1298–1300 (11th Cir. 2002).

**3.** Countrywide generally requires borrowers who do not put twenty percent down when buying a home to purchase PMI from one of seven (now six) PMI providers. The borrower pays the PMI premiums, even though the

mortgage lender is the beneficiary of the policy, and generally has no opportunity to comparison-shop for PMI lenders. Instead, the PMI provider is selected by the lender, here on a rotating basis among the seven providers, all of whom had allegedly agreed with Countrywide to reinsure with Balboa.

**4.** At oral argument before the District Court, counsel for Countrywide described the typical "band" of reinsurance as between four percent and fourteen percent of a book of insurance business. In other words, if the defaults

the primary insurer is solely responsible for additional losses.

Plaintiffs alleged that Balboa did not assume risk commensurate with the amount of premiums it received from plaintiffs' primary mortgage insurers. According to the complaint, Balboa has collected over $892 million in reinsurance premiums since 1999 and has paid nothing in claims. Plaintiffs thus contended that the reinsurance premiums paid to Balboa, Countrywide's affiliate, were kickbacks to Countrywide by the primary insurer, in return for Countrywide's referral of PMI business to the primary insurer, thereby violating RESPA's anti-kickback provision, section 8(a). Plaintiffs also alleged that, under this scheme, Countrywide accepted a portion of the PMI premiums but provided no services in return—it offered only "sham" reinsurance coverage, in violation of section 8(b). As a result of this scheme, plaintiffs contended, they were overcharged for mortgage insurance. They maintained, however, that even if such practices did not result in overcharges— the same assumption we will make in resolving this appeal—they were nonetheless entitled to kickback-free settlements and, thus, the statutory damages set forth at section 8(d)(2). These arrangements, they argue, harm consumers, and harmed them, even in the absence of overcharges, by:

(1) keeping premiums for PMI artificially inflated because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders such as Countrywide; (2) decreasing (or, in fact, eliminating) competition and choice among PMI providers which completely dis-incentivizes them from trying to earn more business through legitimate means such as price or product improvement; and (3) mak[ing] true disclosure of set-

tlement-related costs or potential conflicts of interest difficult or obfuscation of the same easier.

(Appellants' Br. at 13–14.)

Plaintiffs, we note, had yet another reason for pleading a violation of section 8 without alleging a resultant overcharge. In Pennsylvania, PMI providers are required to file their rates with the Pennsylvania Insurance Department ("PID"). *See* 40 Pa. Stat. Ann. § 710–5(a). Once a rate is approved by the PID, the providers cannot charge premiums that vary from that rate. Plaintiffs do not dispute that they paid rates for mortgage insurance that were filed with and approved by the PID. Accordingly, and viewed narrowly, whether or not a portion of their PMI premiums were repackaged as kickbacks to Countrywide, plaintiffs paid the same premiums they would have paid had their policies not been reinsured.

## C.  Procedural History

Countrywide moved to dismiss the complaint, arguing, *inter alia*, that plaintiffs' monthly PMI premiums were filed with the PID and, therefore, *per se* reasonable under the filed rate doctrine. Indeed, said Countrywide, the very reason plaintiffs could not allege an overcharge was because, as Pennsylvania residents, their PMI rates had been approved by the state. Absent an overcharge allegation, Countrywide argued, plaintiffs lacked standing to file suit under RESPA section 8, and lacked as well the requisite injury-in-fact to establish Article III standing. Countrywide also claimed that dismissal was warranted under RESPA's safe harbor provision, section 8(c), which excepts charges for settlement services, otherwise violative of section 8(a) or section 8(b), that are

in a book of business total less than four

percent, no reinsurance payment is triggered.

reasonably related to the value of goods or services provided. 12 U.S.C. § 2607(c)(2).

The District Court granted Countrywide's motion to dismiss. It first noted that, because "[p]laintiffs paid the only legal rate they could have paid for mortgage insurance in Pennsylvania," and those rates were *"per se* reasonable," plaintiffs lacked standing to allege that they paid an artificially inflated PMI rate. (A.9.) Next, having considered whether plaintiffs nevertheless had standing to sue for statutory damages under RESPA without alleging PMI premium overcharges, the Court concluded that section 8(d)(2) "[c]learly . . . entitles persons who paid for any settlement service in violation of RESPA to receive damages equal to three times the amount of any charge paid for settlement services in violation of the statute." (A.11.)

The District Court, however, went further. Because "the purpose of RESPA is to protect individuals from 'unnecessarily high settlement charges,'" it declined to "construe RESPA's damages provision as authorizing Plaintiffs to sue for damages," where they have not been "overcharged." (A.11 (quoting 12 U.S.C. § 2601(a).)) Relying, in part, on the holding in *Carter v. Welles–Bowen Realty, Inc.* ("Carter I"), 493 F.Supp.2d 921 (N.D.Ohio 2007), the Court held that plaintiffs did not satisfy the injury-in-fact requirement for Article III standing and, accordingly, dismissed the complaint "without prejudice for lack of jurisdiction." (A.11–12.) During the pendency of this appeal, the *Carter I* opinion relied upon by the Court was reversed by the Court of Appeals for the Sixth Circuit. *See In re Carter II ("Carter II"),* 553 F.3d 979 (6th Cir.2009) (concluding that an "allegation that [a settlement service provider] violated section 8 is an injury-in-fact, meets the requirements of Arti-

cle III, and is sufficient to survive a . . . motion to dismiss." *Id.* at 989).

## II. Standard of Review

Whether the order of the District Court is more appropriately viewed as having dismissed the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), or for failure to state a claim pursuant to Rule 12(b)(6), our standard of review is the same: we accept as true plaintiffs' material allegations, and construe the complaint in the light most favorable to them. *See Ballentine v. United States,* 486 F.3d 806, 810 (3d Cir.2007) (setting forth standards of review for both Rule 12(b)(1) and 12(b)(6) dismissals).

## III. Discussion

The overriding question before us is whether Congress intended to create a private right of action for a consumer who alleges a violation of RESPA section 8 in connection with his or her settlement, even if that violation does not result in a traditional, monetary injury in the form of an overcharge for settlement services. The resolution of that question requires interpretation of the relevant provisions of RESPA, most particularly section 8. Countrywide does not seriously dispute that, if we answer that question in the affirmative, plaintiffs—and we will continue to call them "plaintiffs" on appeal—will have alleged an injury-in-fact sufficient for purposes of Article III standing. We thus turn to the parties' statutory interpretation arguments before addressing any lingering concerns over Article III standing. *See Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("[T]he inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."). We will also

briefly address Countrywide's argument under the filed rate doctrine.

## A. Statutory Interpretation

■ We begin, as we must, by examining the plain language of the statute. "The role of the courts in interpreting a statute is to give effect to Congress's intent.... Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute." *United States v. Diallo*, 575 F.3d 252, 256 (3d Cir.2009) (quoting *Rosenberg v. XM Ventures*, 274 F.3d 137, 141 (3d Cir.2001)); *see also Lamie v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the test

is not absurd—is to enforce it according to its terms.").[5]

The plain language of RESPA section 8 does not require plaintiffs to allege an overcharge. The best indication of Congress's intent in this regard is the method it prescribed for the calculation of statutory damages in section 8(d)(2). Section 8(a) and section 8(b) proscribe specific types of abusive kickback and referral activities. *See id.* § 2607(a)-(b). Section 8(d)(2), in turn, creates a private right of action for a consumer whereby a defendant is liable for violations of section 8(a) and section 8(b) to the "person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of *any charge paid* for such settlement service." *See id.* § 2607(d)(2) (emphasis added). Critically, none of these provisions contains the word "overcharge" or otherwise implies that the plaintiff must allege that he or she paid more than he or she otherwise would have paid.[6] *See id.*

---

5. Countrywide devotes some attention to the question of whether Congress intended to create personal rights enforceable by the private right of action located at section 8(d)(2). It contends that, because section 8(a) and section 8(b) are worded as prohibitions on the person regulated, rather than as entitlements for the person protected, Congress did not intend, by those provisions, to create personal rights capable of redress via section 8(d)(2). But the cases on which Countrywide relies for this argument—*Gonzaga Univ. v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Wisniewski v. Rodale, Inc.*, 510 F.3d 294 (3d Cir.2007); *Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of Pittsburgh*, 382 F.3d 412 (3d Cir.2004)—concern whether Congress intended to confer personal rights where it did *not* provide an express private right of action, and thus that right of action must be *implied*. That is simply not the case here, where, Congress *explicitly* provided that a violator of section 8 "shall be ... liable to the person ... charged for the settlement service involved in the violation." 12 U.S.C. § 2607(d)(2). As the United States argues in reply, "it would be difficult to craft wording that more explicitly establishes a consumer's

'personal right' to bring suit for a section 8 violation." (Intervenor's Reply Br. at 5.)

6. Use of the term "overcharge" in this and other cases interpreting section 8(d)(2) is different from its use in RESPA cases addressing different questions. In *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384 (3d Cir. 2005), for example, we used the term "overcharge" as distinguished from a "markup": an "overcharge" is shorthand for an "unreasonable" charge for a settlement service rendered by the mortgage lender *itself*, whereas a "markup" is a charge by a lender for a settlement service provided by a *third party*, which the lender increased without providing additional service. *See id.* at 386. Here, plaintiffs allege the payment of traditional, unearned referral fees from the third party PMI provider—i.e., pass-along reinsurance premiums without a corresponding transfer of risk—and, thus, the claims are more akin to the "markups" described in *Santiago*.

Several courts, in resolving the overcharge-versus-markup question, have held that a section 8(b) claim, but not a section 8(a) claim, requires an allegation that plaintiffs paid

§ 2607(a), (b), (d)(2). Instead, damages are fixed at three times the total charge paid by the consumer in exchange for a settlement service, and not merely any overcharge. We agree with plaintiffs and the United States, intervening on plaintiffs' behalf, that the provision of statutory damages based on the entire payment, not on an overcharge, is a certain indication that Congress did not intend to require an overcharge to recover under section 8 of RESPA.

Despite the seemingly obvious meaning of section 8(d)(2), there is a split of district court authority. One line of cases holds that section 8(d)(2) provides treble damages based on the amount of the *overcharge* paid for such settlement service (*i.e.*, traditional compensatory damages).[7] Another line of cases agrees with the reading we give section 8(d)(2)—that Congress pegged damages as three times the *total*

*payment* for an "infected" service, not just any resultant overcharge.[8] As one district court put it, "It is plain from the grammar of the statute that the phrase 'involved in the violation' modifies the immediately preceding term 'service' to mean that RESPA—violating defendants are liable for damages only with respect to the specific services that were provided in connect [sic] with the violation of the statute." *Berger v. Prop. I.D. Corp.*, No. 05–5373, *5 (C.D.Cal. Aug. 17, 2005). It found the statute "not reasonably susceptible" to the construction given in the *Carter I* line of cases because those cases "either fail to address the unambiguous text and grammar of the statute, unreasonably deconstruct the text to render its grammar irrelevant, or otherwise read absent words into its provisions." *Id.* at *6.

In sum, it is clear to us that the plain, unambiguous language of section

---

more for a settlement service than they would have absent the alleged wrongdoing. *See, e.g., Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261, 266 (4th Cir.2002). At this juncture, we need not consider this question, although we note that, as a practical matter, a violation of section 8(b) will likely always involve an overcharge. For instance, suppose a mortgage lender charges a homebuyer $1000 for a title search that actually costs $500. The lender then splits the $500 overcharge with the title search provider. Since that $500, no matter how it was split between lender and searcher, was not for services actually performed, the homebuyer would be entitled to damages. Under section 8(d)(2), those damages would be $3000 (3 × $1000 for the title search). But there would be no split if the lender simply charged the homebuyer $500 for the title search service, because there would be no markup. However, the title search provider might kick $100 back to the lender in exchange for future business, and that would violate section 8(a), even if there was no overcharge paid by the homebuyer. This is consistent with at least one court's view of section 8(b) as a catchall companion to section 8(a) which "attempts to close any loopholes by prohibiting any person from giving or accepting any part of a fee

unless services were actually performed." *Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979, 981 (11th Cir.2003).

7. *See, e.g., Carter I*, 493 F.Supp.2d at 927, rev'd, *Carter II*, 553 F.3d 979; *Mullinax v. Radian Guar., Inc.*, 311 F.Supp.2d 474, 482–86 (M.D.N.C.2004); *Moore v. Radian Group, Inc.*, 233 F.Supp.2d 819, 824–25 (E.D.Tex. 2002); *Morales v. Attorneys' Title Ins. Fund, Inc.*, 983 F.Supp. 1418, 1427–28 (S.D.Fla. 1997); *Durr v. Intercounty Title Co.*, 826 F.Supp. 259, 260 (N.D.Ill.1993), aff'd, 14 F.3d 1183, 1188 (7th Cir.1994). Neither the district court nor the Seventh Circuit in *Durr* analyzed section 8(d)(2), and, instead, assumed, without explanation, that damages under section 8(d)(2) were limited to three times the overcharge. *See* 826 F.Supp. at 260, 14 F.3d at 1188.

8. *See, e.g., Edwards v. First Am. Corp.*, 517 F.Supp.2d 1199, 1203 (C.D.Cal.2007); *Pettrey v. Enter. Title Agency*, 241 F.R.D. 268, 277 (N.D.Ohio 2006); *Robinson v. Fountainhead Title Group Corp.*, 447 F.Supp.2d 478, 488–89 (D.Md.2006); *Kahrer v. Ameriquest Mortgage Co.*, 418 F.Supp.2d 748, 753 (W.D.Pa.2006); *Pedraza v. United Guar. Corp.*, 114 F.Supp.2d 1347, 1351 (S.D.Ga.2000).

8(d)(2) indicates that damages are based on the settlement service amount with no requirement that there have been an overcharge.[9] We thus agree with the conclusion of the Sixth Circuit in *Carter II* that the "ordinary definition of 'any' indicates that charges are neither restricted to a particular *type* of charge (such as an overcharge) nor limited to a specific *part*." 553 F.3d at 986 (citing definition from Webster's Dictionary). In addition, the Sixth Circuit noted that "the phrase 'such settlement services' refers to the preceding phrase 'settlement services involved in the violation.'" *Id.* (citing 12 U.S.C. § 2607(d)(2)). As the United States explains, a single real estate closing may involve several different services, but the charge for each distinct service will not necessarily violate section 8. On this reading, with which we concur, a homebuyer is entitled to three times any charge paid, but only for the service connected to the kickback or fee-split.

District courts have also disagreed as to effect, if any, of the language of other provisions in RESPA on the interpretation of the language of section 8(d)(2). For instance, section 9 prohibits a property seller from requiring the buyer to purchase title insurance from a particular title company. 12 U.S.C. § 2608(a). A section 9 violation results in damages "in an amount equal to three times *all charges* made for such title insurance." *Id.* § 2608(b) (emphasis added). The *Morales*

court, for example, comparing sections 8(d)(2) and 9 side-by-side, concluded that "where Congress intended damages to be based on the entire amount of the settlement charge ... [it used] the words 'all charges.'" 983 F.Supp. at 1417. But by using the phrase "any charge" in section 8(d)(2) and "all charges made for such title insurance" in section 9(b), Congress did not distinguish between the portion of a charge that is excessive and the entire charge. Rather, in section 9(b), Congress recognized that there may be multiple charges for title insurance, some paid by the buyer and some by the seller. The measure of damages for a violation of section 9(a) is triple the amount of "all" title insurance charges combined, not merely the buyer's or seller's amount. Thus, RESPA section 9 has no bearing whatsoever on our interpretation of section 8(d)(2).

It cannot seriously be contended that when Congress sought to differentiate between all charges and a portion of those charges, it did not know how to do so. In section 8(b), for example, Congress differentiated between the overall charge for a settlement service and "any portion, split, or percentage" thereof that is not for services rendered. 12 U.S.C. § 2607(b). Moreover, Congress knew how to limit recovery to actual, out-of-pocket damages. In RESPA section 6, which governs the assignment, sale, or transfer of loan servicing, Congress explicitly limited recovery to

---

9. We summarily dispose of Countrywide's argument that the statutory safe harbor of section 8(c), 12 U.S.C. § 2607(c), saves it from a finding of a right of action without an overcharge. Essentially, section 8(c) provides specific examples of the types of payments and fees for services that are actually performed and not prohibited by section 8(a) and section 8(b), *i.e.* legitimate business is exempted from the strictures of section 8. The entire premise of plaintiffs' complaint is that the captive reinsurance arrangement is *not* a le-

gitimate business arrangement—that Balboa's provision of reinsurance coverage is nothing but a sham and Countrywide collected payment without providing a corresponding service (even if the PMI rates paid by plaintiffs are *per se* reasonable filed rates). Whether it is or is not a legitimate business arrangement—and, thus, whether it is exempted by section 8(c)—is a fundamental merits question that has no bearing whatsoever on what is before us.

the consumer's "actual damages," as well as "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance." *Id.* § 2605(f)(1); *see also id.* § 2605(f)(2) (same distinction in class actions).[10]

The District Court apparently understood the plain language of section 8(d)(2): "[c]learly, the statute entitles persons who paid for any settlement service in violation of RESPA to receive damages equal to three times the amount of any charge paid for settlement services in violation of the statute." (A.11.) But it did not stop there, instead concluding that "the purpose of RESPA"—"to protect individuals 'from unnecessarily high settlement charges'"—trumps the very explicit and the very plain meaning of section 8(d)(2). (*Id.*) It then went on to locate an implicit overcharge requirement in section 8(d)(2), and, in so doing, read into the statute a requirement that it had just concluded the statute did not contain, a result not reached by any court even in the *Carter I* line of cases.

■ The District Court's reliance on purpose after having already discerned a contrary plain language meaning was error. " 'If the intent of Congress is clear, that is the end of the matter; for [we] . . . must give effect to the unambiguously expressed intent of Congress.' " *Santiago v. GMAC Mortgage Group, Inc.,* 417 F.3d 384, 386 (3d Cir.2005) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.,* 543 U.S. 157, 167, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); *Rosenberg,* 274 F.3d at 141 ("Where the statutory language is plain and unambiguous, further inquiry is not required.").

We need look no further than the plain, unambiguous language of section 8(d)(2) in resolving the overcharge question. Because the intent of Congress is clear, that is, indeed, "the end of the matter."[11]

## B. Article III Standing

■ Even if we conclude that, in enacting section 8 of RESPA, Congress vested consumers with the right to a kickback-free real estate settlement, with or without a resultant monetary injury, we must assure ourselves that plaintiffs have suffered an injury-in-fact sufficient to support Article III standing. The parties do not see that as much of a problem; indeed, aside from arguing that Congress did not intend to confer standing through the provision of a private right of action without an overcharge, Countrywide has barely touched on a stand-alone Article III standing argument.

■ Article III standing exists only when the plaintiff has suffered an injury-in-fact, *i.e.,* "an invasion of a legally protected interest" that is "concrete and particularized." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119

---

10. The wording of § 2605(f)(1) is similar to that found in damages provisions of other consumer protection statutes that authorize "actual damages." *See, e.g.,* Truth in Lending Act, 15 U.S.C. § 1640(a)(1); Fair and Accurate Credit Transactions Act, 15 U.S.C. § 1681n(a)(1)(A), (B); Fair Credit Reporting Act, 15 U.S.C. § 1681o(a)(1); Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(1).

11. We thus find it unnecessary and, indeed, inappropriate to consider sources of interpretation beyond the plain language, such as statutory purpose and legislative history, as did the Sixth Circuit (moving on to other authorities due to the "varying views of other courts reviewing these provisions and the arguable ambiguity of the 'any charges paid' phrase"). *Carter II,* 553 F.3d at 986.

L.Ed.2d 351 (1992). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n. 1, 112 S.Ct. 2130. The injury must also be "actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130 (citation and internal quotation marks omitted).

■ Certainly, the fact that plaintiffs' injury is non-monetary is not dispositive. A plaintiff need not demonstrate that he or she suffered actual monetary damages, because "the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (citations omitted); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). The Sixth Circuit specifically compared plaintiffs' right to sue to the plaintiffs in *Havens*, where a "tester" who expected to receive false information regarding the availability of homes for purchase, but who had no intention of buying a home, was held to have standing to bring a suit under the Fair Housing Act. 455 U.S. at 373–74, 102 S.Ct. 1114; *see Carter II*, 553 F.3d at 989. "Just as a violation of the rights of 'testers' to receive 'truthful information' supports standing, so does a violation of the right to receive referrals untainted by conflicts of interest." *Carter II*, 553 F.3d at 989 (citing *Havens*, 455 U.S. at 373–74, 102 S.Ct. 1114). The case before us is not one in which plaintiffs press "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). RESPA only authorizes suits by individuals who receive a loan accompanied by a kickback or unlawful referral, which is plainly a particularized injury, and the very injury pressed here.[12] *See Carter II*, 553 F.3d at 989.

## C. The Filed Rate Doctrine

■ We briefly address one final issue. Countrywide argues that, even if section 8(d)(2) is read to permit suits without an overcharge allegation, plaintiffs' claims are still barred by the filed rate doctrine. The filed rate doctrine provides that a rate filed with and approved by a governing regulatory agency is unassailable in judicial proceedings brought by ratepayers. *See Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir.1994). "The classic example of the preemptive power of the doctrine occurs when a customer makes a claim for a rate that was not filed … - such claims are barred." *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 532 (3d Cir.2006).

■ In Pennsylvania, it is "unlawful for any insurer to use a form or rate disapproved under [the Property and Casualty Filing Reform Act]." 40 Pa. Stat. Ann. § 710–9. The Pennsylvania Insurance De-

---

**12.** The United States compares RESPA to the Fair Debt Collection Practices Act ("FDCPA"), which authorizes both "actual damage[s]" and "additional damages as the court may allow, but not exceeding $1,000," where a debt collector fails to comply with the statute. 15 U.S.C. § 1692k(a)(1), (2)(A). In *Robey v. Shapiro, Marianos & Cejda, L.L.C.*, 434 F.3d 1208 (10th Cir.2006), the court held that the award of "additional damages" is not contingent on proof of "actual damages." *Id.* at 1211–12. The plaintiff in *Robey* "suffered a cognizable statutory injury" based wholly on the invasion of the "legal right[ ]" to fair debt collection treatment, whether or not it had a collectable debt. *Id.* at 1212; *see also Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 777 (9th Cir.1982) ("[A] debtor has standing to complain of violations of the [FDCPA], regardless of whether a valid debt exists."). Similarly, the provision of statutory treble damages in RESPA, based on the total charges paid for the settlement service at issue, obviates an actual damages requirement.

partment has broad authority to protect consumers from excessive insurance rates through rate disapprovals, examinations, and criminal prosecutions. *Id.* §§ 710–7, 710–9, 710–11, 710–18. In addition, consumers challenging a mortgage insurance rate may pursue administrative remedies. *See* 1 Pa.Code §§ 35.9–35.11. Finally, the Insurance Commissioner, either *sua sponte* or prompted by a consumer complaint, can hold hearings and otherwise challenge rates being filed. *Id.* § 35.9. The doctrine has been applied to actions brought under section 8 of RESPA. Countrywide points us particularly to *Morales,* 983 F.Supp. at 1429 (dismissing RESPA "kickback" claim regarding title insurance due to filed rate doctrine under Rule 12(b)(6)).[13]

Plaintiffs counter that the filed rate doctrine does not bar their claims for two reasons. First, they point out that they challenge the payment of kickbacks, not the rates they paid for PMI. As those kickbacks are not, of course, filed with Pennsylvania, the doctrine does not apply. Second, they challenge only the commission of conduct proscribed by statute, such that the existence of a filed rate, or pecuniary harm, is irrelevant.

Aside from *Morales,* the district courts that have decided the issue side with plaintiffs, as do we. In *Kay v. Wells Fargo & Co.,* 247 F.R.D. 572, 576 (N.D.Cal.2007), for example, the court observed that:

> Statutes like RESPA are enacted to protect consumers from unfair business practices by giving consumers a private right of action against service providers. Plaintiffs may not sue under the veil of RESPA if they simply think that the

price they paid for their settlement services was unfair. Alternatively, plaintiffs bringing a suit under RESPA may allege a violation of fair business practices through the use of illegal kickback payments. The filed-rate doctrine bars suit from the former class of plaintiffs and not the latter.

As in *Alexander v. Washington Mutual, Inc.,* No. 08–8043, 2008 WL 2600323, at *3 (E.D. Pa. June 30, 2008) (district court case held c.a.v. pending this case), "[p]laintiffs do not challenge directly the reasonableness or fairness of any rate set by the Commonwealth of Pennsylvania[, but r]ather, . . . claim that defendants' captive reinsurance arrangement constitutes an alleged kickback or fee-splitting scheme in violation of RESPA." Another district court suggested four reasons why the doctrine did not apply to the plaintiffs' similar RESPA claims: (1) the measure of damages is three times the price of PMI, no matter the price, so there is no need to parse or second guess rates; (2) the purpose of RESPA is to protect all consumers by attacking practices that are "harmful to all consumers," not just the named plaintiffs bringing the suit; (3) Congress intended for RESPA to apply to mortgage insurance; and (4) RESPA is remedial and should be construed broadly. *See Patton v. Triad Guar. Ins. Corp.,* No. CV100–132 (S.D.Ga. Oct. 10, 2002), at * *8–14 (attached as "Exhibit E" to plaintiffs' brief). It goes without saying that if we were to find that the filed rate doctrine bars plaintiffs' claims, we would effectively be excluding PMI from the reach of RESPA, a result plainly unintended by Congress.

---

**13.** The only other case cited by Countrywide for this principle is *Stevens v. Union Planters Corp.,* No. Civ. A. 00–CV1695, 2000 WL 33128256 (E.D.Pa. Aug.22, 2000), where the court dismissed RESPA claims alleging that hazard insurance premiums were excessive and constituted unlawful compensation in the form of kickbacks. *Stevens* is inapposite because the plaintiffs in that case directly challenged the filed rate as unreasonable.

It is absolutely clear that the filed rate doctrine simply does not apply here. Plaintiffs challenge Countrywide's allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct.

## Conclusion

We will reverse the Order of the District Court.